IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| **BARRY BUCKHANON and** § | |
| **RODNEY FRALEY,** § | |
| § | |
| Plaintiffs, § | |
| § | |
| vs. § | CASE NO.: 3:05-cv-0741-wkw |
| § | |
| **HUFF & ASSOCIATES** § | |
| **CONSTRUCTION COMPANY, INC.** § | |
| § | |
| Defendant. § | |

**STATEMENT OF FACT AND MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT
HUFF & ASSOCIATES CONSTRUCTION COMPANY, INC.**

COMES NOW the Defendant, Huff & Associates Construction Company, Inc. ("Huff"), and hereby submits the following statement of fact and memorandum of law in support of its Motion for Summary Judgment:

I.  **STATEMENT OF FACT**

This case arises out of an employment relationship between Plaintiffs Rodney Fraley and Barry Buckhanon and Defendant Huff & Associates Construction Company.  On or about June 1, 2004, Fraley and Buckhanon, both African-American males, began work for Huff on a job site in Auburn, Alabama.  See Complaint, ¶9, ¶12.  Huff had previously been hired to construct a new building for the Kappa Alpha (KA) fraternity chapter of Auburn University.  Brad Connell, a Huff employee and an acquaintance of Fraley and Buckhanon, told them that Huff had job openings on the KA project.  See Dep. of R. Fraley, p. 15 line 15 – p. 17 line 15, excerpts attached to Motion as Exhibit A.

Fraley and Buckhanon thereupon went to the job site with Connell, where Bobby Myers, the site superintendent and a Huff employee, interviewed them, hired them, and gave them initial assignments. See Dep. of B. Buckhanon, p. 17 line 16 – p. 21 line 6, excerpts attached hereto as Exhibit B; Fraley Dep. at p. 17 line 15 – p. 19 line 2. Fraley was assigned to assist Connell as a laborer, and Buckhanon was assigned to site cleanup. See Buckhanon Dep. at p. 20 line 11 – p. 21 line 15; Fraley Dep. at p. 20 lines 15–23. Buckhanon claimed an old knee injury (from a high school football injury), and he and Myers discussed Buckhanon's ability to do work on the ground level. See Buckhanon Dep. at p. 31 line 22 – p. 35 line 5; Dep. of R. Myers at p. 40 line 8 – p. 41 line 11, excerpts attached to Motion as Exhibit C. Myers started Fraley and Buckhanon at $8.00 per hour but eventually raised their pay to $9.00 or $9.50. See Buckhanon Dep. at p. 68 line 1 – p. 69 line 4; Fraley Dep. at p. 23 lines 4-20.

Fraley and Buckhanon were two of several Huff employees on site, and there were several subcontractors performing various tasks as well. See Buckhanon Dep. at p. 21, line 19 – p. 22 line 22; Fraley Dep. at p. 19 line 13 – p. 20 line 5. Myers was the senior Huff employee on site on a daily basis, and another employee, Jimmy Langley, oversaw operations in Myers' absence. See Buckhanon Dep. at p. 25 line 4 – p. 27 line 10. As superintendent, Myers had primary responsibility for the construction project. See Dep. of John Huff, p. 21 line 13 – p. 22 line 7, excerpts attached to Motion as Exhibit D. Quentin Williams, a Caucasian male, served as project manager and Myers' supervisor. See Buckhanon Dep. at p. 26 line 2 – p. 27 line 6; Fraley Dep. at p. 21 lines 3-15. Although Williams was on site on a weekly basis, Buckhanon and Fraley knew him to be the project manager and understood him to be Myers' superior. See Huff Dep. at p. 21 line 13 – p. 22 line 7; Buckhanon Dep. at p. 26 line 15 – p. 27 line 1; Fraley Dep. at p. 21 lines 3-15.

Shortly after Fraley and Buckhanon began work, Connell quit his carpenter position; according to Buckhanon, Connell, who is Caucasian, resigned his employment because he "constantly stayed in a fuss with Mr. Myers," who was "cursing and fussing . . . every day." See Buckhanon Dep. at p. 27 line 9 – p. 29 line 12; see also Fraley Dep. at p. 44 lines 3-15. Myers also occasionally cursed at Caucasian employees as well as Hispanic employees. See Buckhanon Dep. at p. 74 line 21 – p. 76 line 23; Fraley Dep. at p. 31 lines 2-9. Other than Connell, Fraley could not recall any other employee quitting because of Myers, nor could he recall Myers terminating anyone other than Buckhanon. See Fraley Dep. at p. 44 lines 16-21.

Myers occasionally transported Fraley and Buckhanon between their homes and the construction site, something that he did not do for other employees. See Fraley Dep. at p. 21 line 16 – p. 22 line 7. At the jobsite, Myers frequently ate lunch with Buckhanon, Fraley, and Jimmy Langley. See Buckhanon Dep. at p. 31 lines 9-21; p. 71 line 22 – p. 72. line 3; Fraley Dep. at p. 28 lines 6-10. On one occasion, the men were talking over lunch, and Myers told Buckhanon and Fraley "y'all's kind don't know anything" and that "n-----s like him don't know anything." See Buckhanon, p. 38 line 17 – p. 41 line 16; p. 70 line 10 – p. 74 line 20; Fraley Dep. at p. 26 line 3 – p. 27 line 3.[1] Buckhanon asked Myers what he meant, to which Myers responded "you know what I mean." See Buckhanon Dep. at p. 40 line 22 – p. 41 line 8. Buckhanon did not pursue the conversation beyond that point. See Buckhanon Dep. at p. 40 line 22 – p. 41 line 8.

On a subsequent occasion, Myers was offsite but was communicating with Jimmy Langley via two-way radio. See Buckhanon Dep. at p. 35 line 6 – p. 38 line 16; Fraley Dep. at p. 27 line 4 – p. 28 line 5. Langley informed Myers that a brick-cleaning task being handled by

---

[1] In his statement to the EEOC, Buckhanon stated that Myers had said "n-----s like him don't know anything." See Buckhanon EEOC statement, attached to Motion as Exhibit E; during deposition, Buckhanon testified that Myers was referring to Fraley and himself rather than some other individual. See Buckhanon Dep. at p. 70 line 10 – p. 74 line 20.

3

another employee was progressing slowly.  See Buckhanon Dep. at p. 35 line 6 – p. 38 line 16. Buckhanon and Fraley were standing nearby cutting boards when they overheard Myers tell Langley that he was "not going to put up with a bunch of n-----s on his job site.  See Buckhanon Dep. at p. 35 line 6 – p. 38 line 16.[2]  Myers was not referring to Buckhanon and Fraley and did not even know they were in earshot of the conversation.  See Buckhanon Dep. at  p. 78 line 14 – p. 79 line 16.   The statement over lunch and the statement to Langley over the two-way radio constitute the only occasions where Buckhanon or Fraley heard Myers use a racial slur.  See Buckhanon Dep. at p. 78 line 6 – p. 79 line 16; Fraley Dep. at p. 27 line 19 – p. 28 line 5, p. 29 line 23 – p. 30 line 5; p. 39 line 22 – p. 40 line 3.

Other than Buckhanon and Langley, Fraley could not identify any other individual who could speak to Myers' alleged use of racial slurs.  See Fraley Dep. at p. 38 lines 7-15. Buckhanon never heard Myers make any other racial slur toward any African-American employee.  See Buckhanon Dep. at p. 48 lines 10-14.  Buckhanon on one occasion heard Myers tell some Hispanic employees that they "don't know nothing" and "need[] to go back where they came from"; Fraley never heard Myers use any racially derogatory language toward Hispanic employees.  See Buckhanon Dep. at p. 45 line 15 – p. 46 line 3; Fraley Dep. at p. 30 line 21 – p. 31 line 1.

On another occasion, Myers and Buckhanon "got in a fuss," which led Myers to send Buckhanon home.  See Buckhanon, p. 61 line 16 – p. 62 line 16; Myers Dep. at p. 42 lines 2-21. The following day, Myers allowed Buckhanon to return to his job position.  See Buckhanon Dep.

---

[2] Myers denied using racially derogatory language as claimed by Plaintiffs.  See Myers Dep. at p. 31 line – p. 32 line 23.  Huff therefore disputes the factual accuracy of plaintiffs' allegations but, for purposes of this motion (only), Huff contends that it is entitled to summary judgment even when the facts are viewed in the light most favorable to the plaintiffs.

4

at p. 61 line 16 – p. 62 line 16; Myers Dep. at p. 42 lines 2-21.  Subsequently, Buckhanon and Myers had another disagreement.  According to Buckhanon, the issue concerned whether work should continue in the presence of a gathering storm.  See Buckhanon Dep. at p. 49 line 14 – p. 52 line 8.  Myers told Buckhanon not to return to work the following day and then drove him home.  See Buckhanon Dep. at  p. 49 line 14 – p. 52 line 8.  Myers testified that he let Buckhanon go because his physical condition (knee/leg) hampered his ability to safely and effectively perform his responsibilities.  See Myers Dep. at p. 41 line 4 – p. 43 line 11.  Myers did not pick Buckhanon up for work the following day, July 26, 2004, and Fraley subsequently confirmed the termination to Buckhanon.  See Buckhanon Dep. at p. 51 line 2 – p. 52 line 4; Fraley Dep. at p. 44 line 22 – p. 46 line 3.  Myers did not use any racial slurs when talking with Buckhanon about continuing to work despite worsening weather conditions.  See Buckhanon Dep. at p. 52 lines 17-23.

Fraley voluntarily ended his employment with Huff on July 27, 2004 – the day after Buckhanon was let go.  See Fraley Dep. at p. 22 lines 16-19; p. 35 line 9 – p. 36 line 1.  Fraley did not give any notice, but simply walked off the jobsite without stating his intentions.  See Fraley Dep. at p. 35 line 9 – p. 36 line 1.  When Myers appeared at Fraley's home the next morning to drive him to the jobsite, Fraley stayed inside his house.  See Fraley Dep. at p. 46 lines 4-18.

Huff maintains signage on every job site indicating that it is an equal opportunity employer.  See Huff Dep. at p. 26 line 16 – p. 27 line 4.  As president of Huff, John Huff would not tolerate the use of racial slurs or racially derogatory language by a supervisor.  See Huff Dep. at p. 27 lines 5-17.  If made aware of allegations of such behavior, John Huff would investigate and terminate the offender if necessary.  See Huff Dep. at p. 27 lines 5-17.   Neither Buckhanon

nor Fraley ever complained to Quentin Williams (project manager and Myers' superior), John Huff, or anyone else regarding Myers' behavior or Buckhanon's termination.  See Buckhanon Dep. at p. 53 line 15 – p. 54 line 4; Fraley Dep. at p. 31 line 10 – p. 32 line 5.  At no time during Myers' employment did Huff receive a complaint that Myers was using racially derogatory language toward employees or exhibited abusive, intimidating, or threatening behavior.  See Huff Dep. at p. 27 line 18 – p. 28 line 4.

## II. MEMORANDUM OF LAW SUPPORTING MOTION FOR SUMMARY JUDGMENT

In their Complaint, Plaintiffs purport to advance two causes of action against Huff.  First, they claim that Myers' alleged behavior constituted a hostile work environment that gives rise to actionable discrimination on account of their race.  See Complaint, ¶¶23-24 citing 42 U.S.C. §2000e-2.  Second, Plaintiffs allege that Huff engaged in intentional discrimination against them based on their race in contravention of 42 U.S.C. §1981.  See Complaint, ¶¶25-26 citing 42 U.S.C. §1981.  This Court's conducts a single analysis, however, since the Eleventh Circuit has observed that "both of these statutes [(i.e., section 1981 and Title VII)] have the same requirements of proof and use the same analytical framework."  See Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (brackets in original).

Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.  See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 124 n.10 (2002).  Federal employment law is clear that "actions toward an employee do not constitute employment discrimination under Title VII unless the conduct is 'sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create

an abusive working environment.'" See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).

In order to establish a hostile work environment, Plaintiffs must show (1) that they belong to a protected group; (2) they have been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms or conditions of his employment; and (5) that Huff is responsible for this environment under either direct or vicarious liability. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). Huff concedes that Plaintiffs belong to a protected group. Moreover, for purposes of this Motion (only), Huff will further proceed under the assumption that Plaintiffs were subjected to two isolated unwelcome statements of a racially-oriented connotation. This Court, however, should bear in mind that alleged harassment must have been based on a protected characteristic of the employee (e.g., race). See Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) (citing commentator for proposition that "discourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable harassment"). Therefore, evidence that Myers may have occasionally cursed or otherwise "fussed at" employees in a non-racial context does nothing to advance Plaintiffs' claims. See St. Hilaire v. Pep Boys, 73 F.Supp.2d 1350, 1364 (S.D. Fla. 1999) (observing that "Title VII does not address generally offensive or unpleasant conduct [and] does not provide a cause of action for . . . harassment that has no reference to race, sex, or national origin"); Carpenter v. Kelley Foods of Alabama, Inc., 2005 U.S. Dist. LEXIS 35453 *10 (M.D. Ala.) quoting Carr v. Allison Gas Turbine Div., 32 F.3d 1007, 1010 (7th Cir. 1994) (observing that "[w]orkers, like other people, often are foul-mouthed and . . . employers are not under a legal duty enforceable by suits

under Title VII to purify the language of the workplace") (ellipsis in original); Thevenin v. Baptist Health Sys. Of So. Fla., 931 F.Supp. 856, 859 (S.D. Fla. 1996). As demonstrated herein, however, Plaintiffs cannot establish that any alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of their employment.[3]

      Whether allegedly harassing conduct was sufficiently severe or pervasive has a subjective component, which focuses on whether the employee subjectively perceives the harassment as sufficiently severe and pervasive, and an objective component, which considers whether "a reasonable person" would find the conduct to be hostile and abusive. Mendoza, 195 F.3d. at 1246. Even a cursory review of federal employment law reveals that most hostile environment litigation of recent advent focuses on the objective component of this inquiry. See Gupta v. Florida Bd. Of Regents, 212 F.3d 571, 583 (11th Cir. 2000) (observing that the "fourth element . . . is the element that 'tests the mettle of most . . . harassment claims'"); Gullatte v. Westpoint Stevens, Inc., 100 F.Supp.2d 1315, 1321-22 (M.D. Ala. 2000) (first ellipsis added, second in original).

      To guide the analysis, the United States Supreme Court and the Eleventh Circuit have employed a four-factor test that evaluates the (1) frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct was physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's job performance. See id. at 1246. The United States Supreme Court has observed that because Title VII was not intended to be a "general civility code," the " '[m]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee' would not sufficiently alter [the]

---

[3] With respect to the fifth element – employer liability for supervisory conduct – Huff does not concede vicarious or direct liability, or that there is even a genuine issue of fact thereon, yet it believes that this Court need not reach that question in light of the demonstrated absence of evidence as to the preceding element.

terms and conditions of employment to violate Title VII." See Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998) citing Rogers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971). In Faragher, the Supreme Court stated that "we have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view." See Faragher, 524 U.S. at 788. Thus, it is only where the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' [that] Title VII is violated." See Morgan, 536 U.S. at 124 quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

In terms of frequency or severity, Plaintiffs' point to two comments ("your kind don't know anything" and "n-----s like him (y'all) don't know anything") directed at them on a single occasion over an approximately two-month employment period. See Dep. of B. Buckhanon, p. 38 line 17 – p. 41 line 16; p. 70 line 10 – p. 74 line 20; Fraley Dep. at p. 26 line 3 – p. 27 line 3. Beyond that, Plaintiffs on one occasion together overheard Myers use a racial slur when speaking to a Caucasian employee over a two-way radio. Buckhanon concedes that the comment concerned another employee and that Myers did not even know that he and Fraley heard the statement. See Dep. of B. Buckhanon, p. 78 line 14 – p. 79 line 16.

These statements attributed to Myers cannot reasonably be characterized as "severe" in nature. The two[4] racially-tinged statements that Myers supposedly directed to Plaintiffs themselves occurred during a single conversation over lunch during a two-month employment period. District courts within the Eleventh Circuit's boundaries have routinely found similar evidence to be insufficient to sustain a hostile environment charge. See, e.g., Hewlett v. Waffle

---

[4] Huff does not concede that the alleged "your kind don't know anything" statement is per se racially demeaning, but it will assume as much for purposes of this motion.

House, Inc., 2006 U.S. Dist. LEXIS 36269 (M.D. Ga.) (holding that "two offensive comments by one employee on the same day within a very short period of time" failed to meet the "severe or pervasive" requirement); cf. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002) (alleged harasser hurled ethnic slurs at plaintiff three to four times per day over one-month employment period). Likewise, the Plaintiffs' single instance of overhearing Myers use a racial epithet that was in no way about, or even directed at, them (indeed, Myers was not even aware of their presence) is unavailing. See Primas v. Bd. Of Regents, 2006 U.S. Dist. LEXIS 14153 (M.D. Ga.) (summary judgment appropriate where plaintiff learned secondhand of racial epithets and was not intended to hear racial slur that she had heard firsthand); Carpenter v. Kelley Foods of Alabama, Inc., 2005 U.S. Dist. LEXIS 35453 *10 n.4 (M.D. Ala.) (holding that racial statements alleged by plaintiffs did not support hostile environment claim because none was directed to plaintiffs); Smith v. Beverly Health & Rehabilitation Services, Inc., 978 F.Supp. 1116, 1131 (N.D. Ga. 1997) (observing that single statement heard by plaintiff, even if a racially derogatory term, was no more than a mere utterance and thus did not rise to level of hostile environment).

Third, there is simply no evidence that Myers' statements were physically threatening or humiliating versus isolated "offensive utterances." Beyond that, there is no evidence that Myers' statements unreasonably interfered with Plaintiffs' ability to perform their job responsibilities. The undisputed facts militate against a conclusion supporting this element of a hostile work environment claim. Among these is the fact that Myers routinely drove Fraley and Buckhanon between their homes in Tallassee and the construction site in Auburn, a gesture Fraley concedes was not offered to other employees. See Fraley Dep. at p. 21 line 16 – p. 22 line 7. Fraley estimated that Myers provided him transportation to and from the worksite for approximately

one month. See Fraley Dep. at p. 21 line 16 – p. 22 line 7. Beyond that, Myers ate lunch with Buckhanon and Fraley at the worksite "just about every day." See Buckhanon Dep. at p. 31 lines 9-21; p. 71 line 22 – p. 72. line 3; Fraley Dep. at p. 28 lines 6-10.

Moreover, Plaintiffs assert that Myers occasionally cursed at other employees, regardless of race, yet, other than Brad Connell, who is Caucasian, Fraley could not recall any employee quitting because of Myers, nor could he recall Myers terminating anyone other than Buckhanon. See Fraley Dep. at p. 31 lines 2-9; p. 44 lines 16-21; Buckhanon Dep. at p. 74 line 21 – p. 76 line 23. Other than his co-plaintiff Buckhanon and Jimmy Langley, Fraley could not identify any other individual who could speak to Myers' alleged use of racial slurs. See Fraley Dep. at p. 38 lines 7-15.

As noted previously, neither Buckhanon nor Fraley ever complained to Myers' supervisor or anyone in Huff management about Myers' language or behavior, see Buckhanon Dep. at p. 53 line 15 – p. 54 line 4; Fraley Dep. at p. 31 line 10 – p. 32 line 5, nor did Huff receive a complaint from any other source that Myers was using racially derogatory language toward employees. See Huff Dep. at p. 27 line 18 – p. 28 line 4. Finally, the undisputed evidence is that Buckhanon was let go for an unwillingness/inability to perform his expected duties as opposed to some racially-motivated reason, and Fraley simply quit his job, giving no notice whatsoever to Myers or Huff. See Myers Dep. at p. 40 line 8 – p. 43 line 11; Buckhanon Dep. at p. 49 line 14 – p. 52 line 8; Fraley Dep. at p. 44 line 22 – p. 46 line 3; p. 22 lines 16-19; p. 35 line 9 – p. 36 line 1.

Viewed through the prism of these facts, it is evident that Myers' alleged statements were not so "severe" or "pervasive" to alter the conditions of Plaintiffs' employment and thereby create an abusive working environment. Consequently, Plaintiffs have failed to establish a key

element of the racial discrimination claims, and Huff therefore moves this Court to enter an Order granting this motion and dismissing the Plaintiffs' claims with prejudice.

/s/ **BENJAMIN C. WILSON**
**(asb-1649-i54b)**
**Attorney for Defendant**
**Huff & Associates Construction Company, Inc.**

**OF COUNSEL:**
**RUSHTON, STAKELY, JOHNSTON**
**& GARRETT, P.A.**
**P.O. Box 270**
**Montgomery, Alabama  36101-0270**
**Phone:  (334) 206-3194**
**Fax:  (334) 481-0831**
**bcw@rsjg.com; dr@rsjg.com**

## CERTIFICATE OF SERVICE

I hereby certify that I have electronically filed above and foregoing document with the Court via CM-ECF, on this the 1st day of August 2006, and that service will be made electronically by CM-ECF on the following counsel of record:

James R. Bowles, Esq.
BOWLES & COTTLE
2 South Dubois Avenue
P.O. Box 780397
Tallassee, Alabama 36078

/s/ Benjamin C. Wilson_____
OF COUNSEL