IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RECEIVED

2006 AUG 21  P 3: 39

| | | |
|---|---|---|
| BARRY BUCKHANON and<br>RODNEY FRALEY, | )<br>)<br>) | |
| Plaintiffs | )<br>) | |
| vs. | )<br>) | CIVIL ACTION NO. 3:05-cv-0741-wkw |
| HUFF & ASSOCIATES<br>CONSTRUCTION COMPANY, INC., | )<br>)<br>)<br>) | |
| Defendant | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

COME NOW the Plaintiffs, and in response to the Defendant's Motion for Summary Judgment and say as follows:

**I.  STATEMENT OF FACTS**

Barry Buckhanon and Rodney Fraley, both African-American males, went to work for Huff & Associates Construction Company on a job site in Auburn, Alabama, on or about June 1, 2004. See Complaint ¶9, ¶12. Huff had previously been hired to construct a new building for the Kappa Alpha (KA) fraternity chapter of Auburn University. Brad Connell, a Huff employee and an acquaintance of Buckhanon and Fraley, told them that Huff had job openings on the KA project. See Dep. of R. Fraley, p. 15 line 15 – p. 17 line 15.

Buckhanon and Fraley thereupon went to the job site with Connell, where Bobby Myers, the site superintendent and a Huff employee, interviewed them, hired them, and gave them initial assignments. See Dep. of B. Buckhanon, p. 17 line 16 – p. 21 line 6;

Fraley Dep. at p. 17 line 15 – p. 19 line 2. Fraley was assigned to assist Connell as a laborer, and Buckhanon was assigned to site cleanup. See Buckhanon Dep. at p. 20 line 11 – p. 21 line 15; Fraley Dep. at p. 20 lines 15-23.

Buckhanon and Fraley were two of several Huff employees on site, and there were several subcontractors performing various tasks as well. See Buckhanon Dep. at p. 21 line 19 – p. 22 line 22; Fraley Dep. at p. 19 line 13 – p. 27 line 5. Myers was the senior Huff employee on site on a daily basis, and another employee, Jimmy Langley, oversaw operations in Myers' absence. See Buckhanon Dep. at p. 25 line 4 – p. 27 line 10. As superintendent, Myers had primary responsibility for the construction project. See Dep. of John Huff, p. 21 line 13 – p. 22 line 7.

Shortly after Buckhanon and Fraley began work, Connell quit his carpenter position; according to Buckhanon, Connell, who was Caucasian, resigned his employment because he "constantly stayed in a fuss with Mr. Myers," who was "cursing and fussing . . . every day." See Buckhanon Dep. at p. 27 line 9 – p. 29 line 12; see also Fraley Dep. at p. 44 lines 3-15. Myers also occasionally cursed at Caucasian employees as well as Hispanic employees. See Buckhanon Dep. at p. 74 line 21 – p. 76 line 23; Fraley Dep. at p. 31 lines 2-9.

At the job site, Myers frequently ate lunch with Buckhanon, Fraley and Jimmy Langley. See Buckhanon Dep. at p. 31 lines 9-21; p. 71 line 22 – p. 72 line 3; Fraley Dep. at p. 28 lines 6-10. On one occasion, the men were talking over lunch, and Myers told Buckhanon and Fraley "y'all's kind don't know nothing" and that "niggers like ya'll don't know anything," See Buckhanon, p. 38 line 17 – p. 41 line 16; p. 70 line 10 – p. 74 line 20; Fraley Dep. at p. 26 line 3 – p. 27 line 3. Buckhanon asked Myers what he

meant, to which Myers responded "you know what I mean." See Buckhanon Dep. at p. 40 line 22 – p. 41 line 8. Buckhanon did not pursue the conversation beyond that point. See Buckhanon Dep. at p. 40 line 22 – p. 41 line 8.

On a subsequent occasion, Myers was off site but was communicating with Jimmy Langley via two-way radio. See Buckhanon Dep. at p. 35 line 6 – p. 38 line 16; Fraley Dep. at p. 27 line 4 – p. 28 line 5. Langley informed Myers that a brick-cleaning task being handled by another employee was progressing slowly. See Buckhanon Dep. at p. 36 line 6 – p. 38 line 16. Buckhanon and Fraley were standing nearby cutting boards when they overheard Myers tell Langley that he was "not going to put up with a bunch of niggers on his job site." See Buckhanon Dep. at p. 35 line 6 – p. 38 line 16.

On one occasion Buckhanon heard Myers tell some Hispanic employees that they "don't know nothing" and " need to go back where they came from". See Buckhanon Dep. at p. 45 line 15 – p. 46 line 3; Fraley Dep. at p. 30 line 21 – p. 31 line 1.

On another occasion, Myers and Buckhanon "got in a fuss," which led Myers to send Buckhanon home. See Buckhanon, p. 61 line 16 – p. 62 line 16; Myers Dep. at p. 42 lines 2-21. The following day, Myers allowed Buckhanon to return to his job position. See Buckhanon Dep. at p. 61 line 16 – p. 62 line 16; Myers Dep. at p. 42 lines 2-21. Subsequently, Buckhanon and Myers had another disagreement. According to Buckhanon, the issue concerned whether work should continue in the presence of a gathering storm. See Buckhanon Dep. at p. 49 line 14 – p. 52 line 8. Myers told Buckhanon not to return to work the following day and then drove him home. See Buckhanon Dep. at p. 49 line 14 – p. 52 line 8. Myers testified that he let Buckhanon go because his physical condition (knee/leg) hampered his ability to safely and effectively

perform his responsibilities. See Myers Dep. at p. 41 line 4 – p. 43 line 11. Myers did not pick Buckhanon up for work the following day, July 26, 2004, and Fraley subsequently confirmed the termination to Buckhanon. See Buckhanon Dep. at p. 51 line 2 – p. 52 line 4; Fraley Dep. at p. 44 line 22 – p. 46 line 3.

Fraley voluntarily ended his employment with Huff on July 27, 2004 – the day after Buckhanon was let go. See Fraley Dep. at p. 22 lines 16-19; p. 35 line 9 – p. 36 line 1. Fraley did not give any notice, but simply walked off the job site without stating his intentions. See Fraley Dep. at p. 35 line 9 – p. 36 line 1. When Myers appeared at Fraley's home the next morning to drive him to the job site, Fraley stayed inside his house. See Fraley Dep. at p. 46 lines 4-18.

Fraley quit because he "didn't want to deal with Mr. Myers anymore just talking to him any kind of way" and "just decided to quit because he didn't want to go back and go hearing that fuss everyday." See Fraley Dep. at p. 35 lines 13-18.

On or about July 30, 2004 Buckhanon and Fraley returned to the job site to pick up their last paychecks. They were driven to the job site by a mutual friend, Jerry Garrett. When they arrived at the job site they ran into Myers and Jimmy Langley who appeared to be leaving the job site in another vehicle. After both vehicles came to a stop Buckhanon and Fraley got out of their vehicle and approached Myers and asked him if they could get their paychecks. At that point Myers began cursing and told Buckhanon and Fraley in substance that they were not going to get their paychecks until they had repaid him the $5.00 which they had previously borrowed. Apparently Buckhanon and Fraley had borrowed $5.00 each to eat lunch a few days earlier. Buckhanon and Fraley told Myers that they would be glad to repay him the $5.00 if he would follow them to the

bank where they could cash their paychecks. Myers told him that he did not have time for that kind of "shit". During the course of the conversation Myers continued cursing in a loud and belligerent manner and called Buckhanon and Fraley "mother-fucking niggers", "black bastards", and "ignorant niggers". Myers used the word "nigger" repeatedly before giving Buckhanon and Fraley their paychecks. See Affidavit of J. Garrett.

Although Jerry Garrett did not know Myers personally prior to July 30, 2004 he had met and observed him on other occasions. He had seen Myers at Hilyer's Auto Parts in Tallassee, Alabama when he would drop by for one reason or another while he was there. On each of those occasions Myers would frequently use the work "nigger" when referring to black folks. See Affidavit of J. Garrett.

Another employee by the name of Bobby Dean Nichols went to work for Huff on July 26, 2004. Prior to going to work for Huff Nichols already knew Buckhanon and Fraley. During the first couple of days of Nichols' employment he overheard Myers use the word "nigger" in speaking to Buckhanon and/or Fraley. According to Nichols, Myers used the word "nigger" frequently in speaking to and about African-Americans. Myers not only used racial slurs in speaking to and about African-Americans but was also constantly cursing and berating the employees working under his supervision. Nichols finally quit his job on or about September 30, 2004 because he could not longer tolerate the loud, profane, intimidating and otherwise abusive behavior by Mr. Myers. According to Nichols, Myers was generally abusive to everyone but was particularly abusive and insensitive to African-Americans. See Affidavit of B. D. Nichols.

At the time of his deposition Buckhanon could only recall two instances when Myers used the word "nigger", but he also stated that Myers used the word on "plenty" of other occasions. See Buckhanon Dep. at p. 48 line 21 – p. 49 line 4; p. 65 lines 10-17.

Myers denies that he ever used the word "nigger" in the presence of Buckhanon and Fraley and further denies that he routinely uses racial slurs in referring to African-Americans. However, Myers does not see anything wrong in using the word "nigger" because black folks were called "niggers" in the Bible. Myers, who is a part-time preacher, sites as his authority Acts 13-1 of the King James Version of the Bible. See Myers Dep. p. 30 line 22 – p. 35 line 4.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

The Defendant is entitled to a summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Federal Rule of Civil Procedure* 56(c). The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried. *Dominick v. Dixie National Life Ins. Co.*, 809 F.2d 1559 (11th Cir. 1987). In considering a motion for summary judgment, the court should view all evidence and any inferences drawn therefrom in the light most favorable to the nonmoving party. *Early v. Champion International Corp.* 907 F.2d 1077 (11th Cir. 1990). Unless the movant can demonstrate that there is no dispute as to any material fact in the case, the movant is not entitled to summary judgment.

## III. <u>MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT</u>

This is an employment discrimination case. The Plaintiffs allege two separate causes of action against their former employer, Huff & Associates Construction

Company. First, they allege that Huff acting through its job superintendent, Bobby Myers, unlawfully discriminated against them on the basis of their race in violation of 42 U.S.C. §2000e-2 by creating a hostile work environment. See Complaint, ¶¶23-24. Second, Plaintiffs allege that Huff engaged in intentional discrimination against them based on their race in violation of 42 U.S.C. §1981. See Complaint ¶¶25-26. The Plaintiffs agree with Defendant that both claims are subject to a single analysis since the Eleventh Circuit has observed that "both of these statues [(i.e., section 1981 and Title VII)] have the same requirements of proof and use the same analytical framework." See Shields v. Fort James Corp., 305 F.3d 1280, 1282 (11th Cir. 2002) (brackets in original).

Plaintiffs further agree with Defendant that hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment. See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 124 n.10 (2002).

A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victims employment and create an abusive working environment. See Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

To establish a hostile work environment claim under Title VII, an employee must show: (1) that he belongs to a protected group; (2) that he has been subjected to unwelcome harassment; (3) that the harassment must have been based on a protective characteristic of the employee such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and

create a discriminatory abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability. See Miller 277 F.3d at 1275.

Huff concedes that Plaintiffs belong to a protected group and for purposes of the Motion for Summary Judgment (only), Huff concedes that Plaintiffs were subjected to at least two unwelcome racially derogatory statements. See Defendant's brief at p. 7. Huff appears unwilling to concede that the alleged harassment was based on a protected characteristic of the employee (e.g. race) but the undisputed evidence is that both Buckhanon and Fraley are African-Americans. Thus, the only genuine issue is whether the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of the Plaintiffs' employment.

The requirement that the harassment must be sufficiently severe or pervasive to alter the terms and conditions of employment in order to be actionable under Title VII contains both an objective and a subjective component; thus, the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceived to be abusive. See Miller, 277 F.3d at 1276.

In evaluating the objective severity of the harassment underlying a Title VII claim, the United States Supreme Court and the Eleventh Circuit consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. The Eleventh Circuit takes a totality of the circumstances approach in determining whether

the harassment underlying a Title VII claim is sufficiently severe or pervasive to alter terms or conditions of employment. See Miller, 277 F.3d at 1276.

Although Buckhanon could only recall two specific instances and Fraley could only recall three specific instances where Myers used the term "nigger" in speaking directly to them or about African-Americans in general, he testified that Myers used the work "nigger" on "plenty" of other occasions. See Buckhanon Dep. at p. 48 line 21- p. 89 line 4; p. 65 lines 10-17. Another employee, Bobby Dean Nichols, stated that he overheard Myers addressing Buckhanon and/or Fraley as "niggers" on more than one occasion during the first two days of his employment with Huff. According to Nichols, Myers used the word "nigger" frequently in speaking to and about African-Americans. Myers not only used racial slurs in speaking to and about African-Americans but he was also constantly cursing and berating the employees working under his supervision. Nichols finally quit his job after working only two months because he could no longer tolerate the loud, profane, intimidating and otherwise abusive behavior by Mr. Myers. Although Myers was generally abusive to everyone, he was particularly abusive and insensitive to African-Americans. See Affidavit of B. D. Nichols. Jerry Garrett, testified that he overheard Myers call Buckhanon and Fraley "mother-fucking niggers", "black bastards", and "ignorant niggers" whenever he drove Buckhanon and Fraley to the job site to pick up their last paychecks. Garrett further testified that he had overheard Myers using the word "nigger" on other occasions when Myers would stop by Hilyer's Auto Parts in Tallassee, Alabama. See Dep. of J. Garrett. Buckhannon, Fraley, Nichols and Garrett all testified that in addition to using racial slurs and epitaphs Myers was constantly cursing and generally abusive to the employees working under his supervision.

In his deposition testimony Myers inadvertently revealed the characteristics of a true racist. While denying that he ever used the word "nigger" in the presence of Buckhanon and Fraley and further denying the routine use of racial slurs in referring to African-Americans, he admitted that he did not see anything wrong in using the term "nigger" because black folks were called "niggers" in the Bible. Myers, who is a part-time preacher cites as his authority Acts 13:1 of the King James Version of the Bible. See Myers Dep. p. 30 line 22- p. 35 line 4. Myers ability to quote chapter and verse to justify the use of a racial slur is strong evidence that Myers has preached on this subject before and that he has a deep seeded belief of racial superiority.

Any reasonable person would find Myers conduct to be both hostile and abusive and certainly any victim of such conduct would subjectively perceive it as abusive. When a white man calls a black man a "nigger" to his face and repeatedly uses racial slurs in his presence it is more than mere offensive or unpleasant conduct. This is especially true when the white man is in a supervisory position and the black man is his subordinate. Such conduct is humiliating and cannot help but interfere with the employee's ability to perform his job.

In determining whether Myers' conduct unreasonably interfered with the Plaintiffs' job performance both the Supreme Court and Eleventh Circuit have cautioned that harassment need not be shown to be so extreme that it produces tangible affects on job performance in order to be actionable. Thus, having established a frequency, severity, and humiliating nature of the conduct, any failure by the Plaintiffs to establish convincingly how Myers conduct interfered with their duties is not fatal to their hostile environment claims, given the totality of the circumstances. See Harris v. Forklift

Systems, Inc., 510 U.S. 17, 21, 1145 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); See Miller, 277 F.3d at 1276.

Finally, Huff is responsible for the hostile work environment created by Myers under the theory of vicarious liability. Under Title VII, an employer is subject to vicarious liability to a victimized employee for an actionable, hostile environment created by a supervisor with immediate or successively higher authority over the employee. See Miller, 277 F.3d at 1278, citing Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998). In this case Myers was the Plaintiffs' immediate supervisor and had complete authority over all aspects of the Plaintiffs employment.

If all of the above evidence and any inferences drawn therefrom is considered in a light most favorable to the Plaintiffs the Defendant's Motion for Summary Judgment is due to be denied. Plaintiffs therefore urge the Court to deny the Motion for Summary Judgment and allow this matter to proceed to trial.

/s/ James R. Bowles
JAMES R. BOWLES (BOW011)
ATTORNEY FOR PLAINTIFFS

OF COUNSEL:
Bowles & Cottle
Attorneys at Law
P.O. Box 780397
2 So. Dubois Avenue
Tallassee, Alabama 36078
(334) 283-6548
Fax: (334) 283-5366

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above Plaintiffs' Submissions in Response to Defendant's Motion of Summary Judgment to Benjamin C. Wilson, Esq., Attorney for Defendant, by mailing a copy thereof, postage prepaid, to him at his proper mailing address of RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A., Post Office Box 270, Montgomery, Alabama 36101-0270 on this the 21st day of August, 2006.

/s/ _____
OF COUNSEL