# FREEDOM COURT REPORTING

1

1       IN THE UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF ALABAMA

3             EASTERN DIVISION

4    CIVIL ACTION NUMBER:  3:05-cv-0741-WKW

5    BARRY BUCKHANON and RODNEY FRALEY,

6         Plaintiffs,                 ORIGINAL

7         vs.

8    HUFF & ASSOCIATES CONSTRUCTION

9    COMPANY, INC.,

10        Defendant.

11

12    **DEPOSITION OF ROBERT LEE MYERS, JR.**

13         In accordance with Rule 5(d) of

14   The Alabama Rules of Civil Procedure as

15   Amended, effective May 15, 1988, I,

16   VIRGINIA DENESE BARRETT, am hereby

17   delivering to Mr. James R. Bowles, the

18   original transcript of the oral testimony

19   taken on the 26th day of April, 2006,

20   along with exhibits.

21         Please be advised that this is

22   the same and not retained by the Court

23   Reporter, nor filed with the Court.

EXHIBIT

1  F

# FREEDOM COURT REPORTING

2

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4     CIVIL ACTION NUMBER: 3:05-cv-0741-WKW

5     BARRY BUCKHANON and RODNEY FRALEY,

6                    Plaintiffs,

7                    vs.

8     HUFF & ASSOCIATES CONSTRUCTION

9     COMPANY, INC.,

10                   Defendant.

11

12              S T I P U L A T I O N

13              IT IS STIPULATED AND AGREED by

14    and between the parties through their

15    respective counsel, that the deposition of

16    ROBERT LEE MYERS, JR., may be taken before

17    Denese Barrett, Commissioner, at the

18    offices of Adams, Umbach, Davidson &

19    White, 205 South 9th Street, Opelika,

20    Alabama, on the 26th day of April, 2006.

21              IT IS FURTHER STIPULATED AND

22    AGREED that the signature to and the

23    reading of the deposition by the witness

# FREEDOM COURT REPORTING

3

1    is waived, the deposition to have the same

2    force and effect as if full compliance had

3    been had with all laws and rules of Court

4    relating to the taking of depositions.

5         IT IS FURTHER STIPULATED AND

6    AGREED that it shall not be necessary for

7    any objections except as to form or

8    leading questions, and that counsel for

9    the parties may make objections and assign

10   grounds at the time of the trial, or at

11   the time said deposition is offered in

12   evidence, or prior thereto.

13        IT IS FURTHER STIPULATED AND

14   AGREED that the notice of filing of the

15   deposition by the Commissioner is waived.

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

4

1                           INDEX

2    EXAMINATION BY:                PAGE NUMBER:

3    Mr. Bowles                              6

4                     EXHIBIT INDEX

5    PLAINTIFFS' EXHIBITS:          PAGE NUMBER:

6    1 - Barry Buckhanon Separation        40

7        Notice

8    2 - Rodney Fraley Separation Notice   45

9    3 - Bobby Nichols Separation Notice   45

10   4 - John McDade Separation Notice     46

11   5 - Robert Connell Separation Notice  47

12   6 - Travis Gilson Separation Notice   48

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

5

1            IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4    CIVIL ACTION NUMBER:  3:05-cv-0741-WKW

5    BARRY BUCKHANON and RODNEY FRALEY,

6              Plaintiffs,

7              vs.

8    HUFF & ASSOCIATES CONSTRUCTION

9    COMPANY, INC.,

10             Defendant.

11   BEFORE:

12     VIRGINIA DENESE BARRETT, Commissioner

13   APPEARANCES:

14            BOWLES & COTTLE, by Mr. James R.

15   Bowles, 2 South Dubois Avenue, Tallassee,

16   Alabama 36078, appearing on behalf of the

17   Plaintiffs.

18            RUSHTON, STAKELY, JOHNSTON &

19   GARRETT, by Mr. Ben C. Wilson, 184

20   Commerce Street, Montgomery, Alabama,

21   36104, appearing on behalf of the

22   Defendant.

23   ALSO PRESENT:  Patricia Huff & John Huff

# FREEDOM COURT REPORTING

6

1          ROBERT LEE MYERS, JR.

2          The witness, having been first

3    duly sworn or affirmed to speak the truth,

4    the whole truth, and nothing but the

5    truth, testified as follows:

6                 EXAMINATION

7    BY MR. BOWLES:

8          Q.    Would you state your name for

9    the record, please, sir?

10          A.    Robert Lee Myers.

11          Q.    Are you Robert Lee Myers,

12    Jr.?

13          A.    Right.

14          Q.    Mr. Myers, my name is Bobby

15    Bowles, and I'm a lawyer in Tallassee,

16    Alabama.  I represent Barry Buckhanon and

17    Rodney Fraley in this lawsuit that they

18    filed against Huff and Associates

19    Construction Company.  I'm going to be

20    asking you some questions this morning.

21    If I ask you a question that you don't

22    understand, just ask me to repeat it or

23    rephrase it for you.  Okay?

# FREEDOM COURT REPORTING

7

1          A.      (Witness nodding head in the
2     affirmative.)
3          Q.      Now, I may have to ask you
4     some questions that's kind of sensitive,
5     but that's my job and I'm going to try to
6     be courteous to you.  But I just want you
7     to give me a good answer.  Okay?
8          A.      Now, you're going to have to
9     speak out because I am hard of hearing.
10         Q.      All right.  Where do you
11    currently live?
12         A.      I live at Central, Alabama.
13         Q.      What is your address?
14         A.      It's 797 Mann Road.
15         Q.      Have you ever lived at 679
16    Mann Road?
17         A.      That's it right there.
18         Q.      Okay.  Is that a Wetumpka
19    address?
20         A.      Right.
21         Q.      And that's in Elmore County?
22         A.      Right.
23         Q.      How old are you, Mr. Myers?

# FREEDOM COURT REPORTING

8

1          A.      Seventy years old.

2          Q.      What's your birthday?

3          A.      February the 22nd, 1936.

4          Q.      What is your Social Security

5    number?

6          A.      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.

7          Q.      Are you married?

8          A.      Yes, sir.

9          Q.      What's your wife's name?

10         A.      Sandra Gates Myers.

11         Q.      How long have you and your

12   wife been married?

13         A.      About forty-six years.

14         Q.      Have you ever been married to

15   anyone else?

16         A.      Yes, sir.

17         Q.      How many other women have you

18   been married to?

19         A.      One more.  Elizabeth Collins.

20         Q.      Okay.  Does she live in

21   Elmore County?

22         A.      No.

23         Q.      Where does she live?

# FREEDOM COURT REPORTING

9

1          A.      She lives in Montgomery.  I

2    don't know where she is now.  That's --

3    that's got away.  We parted.

4          Q.      Did you have any children by

5    your first wife?

6          A.      Two.

7          Q.      What are their names and

8    ages?

9          A.      Donnie Levins and Johnny

10   Levins.

11         Q.      How do you spell Levins?

12         A.      L-E-V-I-N-S.

13         Q.      And where do they live?

14         A.      I can't answer that either.

15         Q.      You don't know?

16         A.      One of them lives up in

17   Kansas.  But the other one, I don't know

18   where they live.

19         Q.      They don't live in this area?

20         A.      No.

21         Q.      Okay.

22         A.      No.

23         Q.      Do you have any children by

# FREEDOM COURT REPORTING

10

1    your current wife?

2         A.    Yes, sir.  I have six.  Three

3    boys and three girls.

4         Q.    Okay.  Can you give me their

5    names and ages?  Well, are they all grown?

6         A.    They're all grown.

7         Q.    Okay.  Give me their names

8    and tell me where they live.

9         A.    All right.  Deborah Dew lives

10   in Wetumpka.

11        Q.    Okay.

12        A.    Tammy lives over where I do,

13   same thing.

14        Q.    What's Tammy's last name?

15        A.    Cope, C-O-P-E.  And Jimmy

16   Myers, he lives about two miles from me.

17   I don't know his address.

18        Q.    Okay.  Who else?

19        A.    Mark Myers, Mary Myers.  Mary

20   lives in Slapout.  I don't know Mark's

21   address.

22        Q.    What's Mary's last name?

23        A.    Mobley.

# FREEDOM COURT REPORTING

11

1          Q.      Mobley?

2          A.      Right.

3          Q.      Okay.  I've got five children

4    here.  Did I miss one?

5          A.      Probably.

6          Q.      Okay.  I've got Deborah,

7    Tammy, Jimmy, Mark and Mary.

8          A.      And Robert Myers.

9          Q.      Where does Robert live?

10         A.      I can't tell you that.  I

11   don't know.

12         Q.      He doesn't live around here?

13         A.      No, sir.

14         Q.      What does Deborah do for a

15   living?  Does she work?

16         A.      No, sir.

17         Q.      What's her husband's name?

18         A.      Lord, he's a Duke.  That's

19   all I know.  Any other time I could have

20   told you.  My mind is not too good no

21   more.  Anyway, he's a Duke.

22         Q.      Does Tammy work?

23         A.      No, sir.

# FREEDOM COURT REPORTING

12

1      Q.     What is her --

2      A.     Her husband's name is Brad

3  Cope.

4      Q.     What does he do?

5      A.     He's an air condition worker.

6      Q.     Okay.  And where does Jimmy

7  work?

8      A.     Jimmy can't work.  He's got a

9  bad back.  He's on disability.

10     Q.     Okay.  And where does Mark

11  work?

12     A.     Mark don't work nowhere

13  either.  He's got a bad heart.

14     Q.     And does Mary work?

15     A.     Yes, sir.  She works for

16  Wal-Mart.

17     Q.     Where?

18     A.     In Prattville.

19     Q.     Okay.  And is she married?

20     A.     Yes, sir.

21     Q.     What is her husband's name?

22     A.     Mr. Mobley.  Andy Mobley.

23     Q.     What does he do?

# FREEDOM COURT REPORTING

13

1          A.     He works for a tree service.

2          Q.     And what does Robert Myers

3     do?

4          A.     I don't know.  We don't ever

5     see him.  He disappeared on us.

6          Q.     Okay.

7          A.     He comes by about twice a

8     year.  That's about it.

9          Q.     How far did you go in school,

10    Mr. Myers?

11         A.     Ninth grade.

12         Q.     Okay.  Did you ever go back

13    and get your GED?

14         A.     In the Marine Corps.

15         Q.     And when did you serve in the

16    Marine Corps?

17         A.     Oh, back '52, '53.

18         Q.     Did you go to Korea?

19         A.     Yes, sir.  We just went in

20    there for a few days and was out.

21         Q.     How long were you in the

22    service?

23         A.     Three years.

# FREEDOM COURT REPORTING

14

1          Q.      Okay.  Did you get an

2     honorable discharge?

3          A.      Yes, sir.

4          Q.      Have you had any education or

5     schooling past the ninth grade?

6          A.      No.  All I got was in the

7     Marine Corps.  That finished my education

8     up.

9          Q.      Did you ever go to a trade

10    school or anything like that?

11         A.      No, sir.

12         Q.      Okay.

13         A.      Back then you didn't have the

14    time.

15         Q.      Okay.  Are you currently

16    employed?

17         A.      No, sir.

18         Q.      Are you retired?

19         A.      I'm retired.

20         Q.      When did you retire?

21         A.      Oh, September.

22         Q.      Of last year?

23         A.      Right.

# FREEDOM COURT REPORTING

15

1    Q.    And where were you working at

2    the time you retired?

3    A.    Mr. Huff.  Huff and

4    Associates.

5    Q.    Is that Huff and Associates

6    Construction Company?

7    A.    Right.

8    Q.    What was your position with

9    Huff and Associates Construction Company

10   at the time of your retirement?

11   A.    Superintendent.

12   Q.    How long had you been working

13   for Huff and Associates at that time?

14   A.    Roughly twenty years.

15   Q.    Okay.  What year did you

16   first go to work with Huff and Associates?

17   A.    Oh, 1980 I believe is when.

18   Q.    Just give me your best

19   judgment about it.

20   A.    About 1980.

21   Q.    I saw something in a document

22   where you might have gone to work with

23   them in 1994.  Would that be incorrect?

# FREEDOM COURT REPORTING

16

1          A.      Well, that's the second time

2    I went with them.

3          Q.      Okay.

4          A.      I left for a while.

5          Q.      The first time was about

6    1980?

7          A.      Right.

8          Q.      And how long did you work

9    with them before you left the company?

10         A.      Probably two years.

11         Q.      And how long did you stay

12   gone before you went back?

13         A.      Several years there.  Five or

14   six years.

15         Q.      Okay.  Would it be fair to

16   say you went back in 1994?

17         A.      Right.

18         Q.      Okay.  And did you work with

19   Huff and Associates continuously from 1994

20   up until your retirement?

21         A.      Right.

22         Q.      Okay.  What was your position

23   during the years 1994 up until your

# FREEDOM COURT REPORTING

17

1  retirement?

2          A.      Superintendent.

3          Q.      Okay.  Now, what is your

4  understanding of a superintendent's

5  duties?  What did you do?

6          A.      Tried to build a building.

7          Q.      Okay.  Well, I mean, were you

8  the man in charge on the job site?

9          A.      Right.

10          Q.      Okay.  You were the highest

11  ranking employee of the company on the job

12  site?

13          A.      Right.

14          Q.      Okay.  Have you -- has your

15  entire adult life pretty much been in the

16  construction field?

17          A.      Yes, sir.

18          Q.      I've also heard that you

19  might be a lay preacher; is that correct?

20          A.      Right.

21          Q.      Where do you preach?

22          A.      Just wherever they need me

23  now.

# FREEDOM COURT REPORTING

18

1    Q.    Okay.  Do you have a church?

2    A.    I preached at a church -- not

3  no regular church.  I preached at one

4  church fifteen years.

5    Q.    Where was that?

6    A.    Kendricks Baptist Church.

7    Q.    What's the name of it?

8    A.    Kendricks Baptist Church.

9    Q.    Where is that located?

10    A.    Nixburg.

11    Q.    Well, I have to ask you where

12  is Nixburg?

13    A.    On Highway 9 just below

14  Alexander City.

15    Q.    Okay.  Is that in Elmore

16  County?

17    A.    No, sir.  It was up in Coosa

18  County.

19    Q.    Coosa County.  Okay.  And you

20  were the pastor there for fifteen years?

21    A.    Right.

22    Q.    Were you a full-time pastor?

23    A.    Full-time pastor.

# FREEDOM COURT REPORTING

19

1       Q.      You were the only pastor they

2    had?

3       A.      Right.

4       Q.      Okay.  How big a church was

5    that?

6       A.      Oh, congregation usually run

7    about forty, forty-five, somewhere around

8    in that area.

9       Q.      I may have missed this.  Did

10   you say that was a Baptist church?

11      A.      Right.

12      Q.      Okay.  Were you ordained as a

13   Baptist minister?

14      A.      Right.

15      Q.      Okay.  And when were you

16   ordained?

17      A.      In 1990.

18      Q.      Okay.  Are you still

19   preaching?

20      A.      Yes, sir.

21      Q.      Where do you preach now?

22      A.      Wherever they want me.

23      Q.      Well, I mean, do you just

# FREEDOM COURT REPORTING

20

1  wait for someone to call you to fill in?

2          A.     Most of the time somebody

3  will call me during the week, and I'll go

4  preach for them.

5          Q.     Okay.

6          A.     I don't want a regular

7  church.  I'm not trying to get out of it,

8  but I don't want a regular church.

9          Q.     Okay.  About how often do you

10 preach in a month's time?

11         A.     Two, three times.

12         Q.     Okay.  Have you ever attended

13 any theological schools?

14         A.     I don't think so.

15         Q.     Okay.  Or religious schools?

16         A.     No, sir.  I just come up

17 under a bunch of preachers.

18         Q.     Okay.  Do you consider

19 yourself to be a religious man?

20         A.     I hope so.

21         Q.     Do you know the plaintiff in

22 this case, Barry Buckhanon?

23         A.     Yes, sir.

# FREEDOM COURT REPORTING

21

1    Q.    Okay.  How long have you

2  known Barry Buckhanon?

3    A.    Oh, he was brought on my job.

4    Q.    Do you recall the first time

5  you ever met Barry Buckhanon?

6    A.    Yes, sir.  When they brought

7  him up there to get him a job.

8    Q.    Would that have been in 2004?

9    A.    That's right.

10    Q.    Who brought him up there?

11    A.    Lord have mercy.  It was one

12  of the white fellows that I'd hired.

13    Q.    Was his name Robert Connell?

14    A.    Right.  That's him.

15    Q.    Did Mr. Connell bring Barry

16  Buckhanon to your job site?

17    A.    Right.

18    Q.    And what was said to you at

19  that time about Barry Buckhanon?  Did he

20  just want a job?

21    A.    He just wanted a job.

22    Q.    Did you hire him?

23    A.    Yeah.

# FREEDOM COURT REPORTING

22

1     Q.    Okay.  And what did you hire

2  him as?  A laborer?

3          A.    As a laborer.

4          Q.    And do you remember about

5  when he went to work for Huff and

6  Associates?

7          A.    No, sir, I don't.

8          Q.    Okay.  Well, let's make this

9  clear.  When you hired him, you were

10  hiring him for Huff and Associates, right?

11          A.    Right.

12          Q.    And what job site did you

13  assign Mr. Buckhanon to?

14          A.    KA House.  What he done on

15  the job?  Any type of labor work we had to

16  do.

17          Q.    You just put him to work at

18  the Kappa Alpha House at Auburn

19  University?

20          A.    Right.

21          Q.    And would that have been in

22  early June of 2004?

23          A.    That's right.

# FREEDOM COURT REPORTING

23

1          Q.      Do you know the other

2     plaintiff in this case, Rodney Fraley?

3          A.      Yeah.

4          Q.      When did you first meet

5     Rodney Fraley?

6          A.      Same time.

7          Q.      Okay.  Did Rodney Fraley and

8     Barry Buckhanon come to you at the same

9     time?

10         A.      Right.

11         Q.      And Robert Connell brought

12    both of them to you?

13         A.      Right.

14         Q.      And did you hire Rodney

15    Fraley as well as Barry Buckhanon?

16         A.      Right.

17         Q.      Did you also put Rodney

18    Fraley to work at the KA House --

19         A.      Right.

20         Q.      -- at Auburn University?

21         A.      Right.

22             MR. WILSON:  Let him finish

23                  first.  Let him finish his

# FREEDOM COURT REPORTING

24

1          question.  Okay.  Y'all are

2          kind of talking over each

3          other.

4     Q.     Okay.  Did you put Rodney

5  Fraley to work at the KA House the same as

6  you did Barry Buckhanon?

7     A.     That's right.

8     Q.     And did you hire Rodney

9  Fraley as a laborer as well?

10     A.     Well, I really hired him to

11  help the carpenters.

12     Q.     So he was a carpenter's

13  helper?

14     A.     Right.

15     Q.     Do you make a distinction

16  between a laborer and a carpenter's

17  helper?

18     A.     Well, there's not too much

19  difference.  On that carpenter's helper,

20  he's supposed to help the carpenters.  A

21  laborer is supposed to clean up or

22  whatever is there to do.

23     Q.     And to reiterate, were you

# FREEDOM COURT REPORTING

25

1    the superintendent on the job site at the

2    KA House at Auburn University?

3        A.    Right.

4        Q.    What was Huff and Associates

5    hired to do at the KA House?

6        A.    To build it.

7        Q.    Going to build a brand new

8    one?

9        A.    Right.

10       Q.    Do you remember when you

11   started that job?

12       A.    Oh, I started it in 2003.    I

13   hired them in 2004.

14       Q.    When did you finish the job?

15       A.    2006.    In about February,

16   March.

17       Q.    Okay.    And, again, were you

18   the highest ranking employee of Huff and

19   Associates on that job site at the KA

20   House?

21       A.    Right.

22       Q.    And were you the highest

23   ranking employee from the time the job

# FREEDOM COURT REPORTING

26

1   started up until the time it was finished?

2        A.    Right.

3        Q.    I know the number of

4   employees probably fluctuated a little bit

5   during the construction of that fraternity

6   house.  But approximately how many

7   employees did Huff and Associates have

8   working on that job site at any one time?

9        A.    Probably about six.

10       Q.    Six full-time people?

11       A.    Right.

12       Q.    Does that include yourself?

13       A.    Right.

14       Q.    Does it include Barry

15   Buckhanon and Rodney Fraley?

16       A.    Right.

17       Q.    You mean you just had six

18   people working on a project that big?

19       A.    That's all I had.

20       Q.    Okay.  Who were the other

21   employees on that job site?

22       A.    I'd have to go back on the

23   time sheets to see.  But I had Travis

# FREEDOM COURT REPORTING

27

1    Gilson.

2              Q.     What was Mr. Gilson's job?

3              A.     He's a carpenter.

4              Q.     Okay.  Did he work there the

5    whole time that the house was being built?

6              A.     No, sir.  Travis got him a

7    part-time job, and he was -- and he

8    started using our job as a part-time job.

9    He'd work there about one or two days a

10   week.  Well, I couldn't stand that.  I had

11   to let him go.  And I had Mark Myers.  He

12   worked there probably a third of the time

13   that we was going on.

14             Q.     Now, is that your son?

15             A.     Right.

16             Q.     Okay.  What was Mark's job?

17             A.     Carpenter.

18             Q.     Okay.  Did he work there the

19   whole time?

20             A.     No, sir.  He only worked

21   there about a third of the time.

22             Q.     Okay.  And who else worked

23   there?

# FREEDOM COURT REPORTING

28

1          A.      And, Lord, I don't know.    I

2    had Jimmy Langley.    He worked there about

3    a third of the time.

4          Q.      What was his job?

5          A.      On the KA House, yeah.

6          Q.      What was his job?

7          A.      Oh, he was a carpenter.'

8          Q.      Okay.   Anyone else?

9          A.      That's about it as far as I

10   can -- I worked some Mexicans, but they

11   didn't stay that long.   They moved them to

12   another job.

13         Q.      Who moved them?

14         A.      Mr. Huff and them.

15         Q.      Okay.   Did you have any brick

16   masons or block masons on that job?

17         A.      They were subs.

18         Q.      Okay.   So the six people that

19   you were referring to were all employees

20   of Huff and Associates?

21         A.      Of Huff and Associates.

22         Q.      But there were other people

23   working out there?

# FREEDOM COURT REPORTING

29

1        A.      Oh, yeah.

2        Q.      But they were subcontractors?

3        A.      Right.

4        Q.      And they were not under your

5   direct supervision, were they?

6        A.      No, sir.  Not exactly under

7   mine.  I try to keep it laid out in front

8   of me and keep them going.  That's all I

9   done for them.

10       Q.      Out of the employees that

11  Huff and Associates had working on the KA

12  House in June and July of 2004, how many

13  of them were black?

14            MR. WILSON:  Just in that time

15               frame?

16            MR. BOWLES:  Well, yes.

17       A.      Probably one.

18       Q.      And who was that?

19       A.      Ervin -- Lord, I can't even

20  think of his last name now.  Ervin was a

21  good worker.  He just couldn't keep his

22  mouth shut.

23       Q.      Okay.  Well, of course,

# FREEDOM COURT REPORTING

30

1    Rodney Fraley and Barry Buckhanon were

2    working there, weren't they?

3        A.    Yeah.

4        Q.    And they were black?

5        A.    They were black.

6        Q.    Okay.  Did you have any

7    Mexican or Hispanic workers working there?

8        A.    Yes, sir.  I had a couple

9    Spanish ones, one that finished the job

10   over there.  I can't remember their names

11   either.

12       Q.    Did you have any white

13   employees other than James Langley and

14   Travis Gilson?

15       A.    And Mark Myers.

16       Q.    Mark Myers?

17       A.    That's about it.

18       Q.    So you had about three black

19   employees, three white employees and a

20   couple of Mexicans?

21       A.    Right.

22       Q.    During the time that Barry

23   Buckhanon and Rodney Fraley were working

# FREEDOM COURT REPORTING

31

1    under your supervision at the KA House,

2    did you ever use the word nigger in their

3    presence?

4              A.    Not that I can remember.

5              Q.    Okay.  If Barry Buckhanon and

6    Rodney Fraley said they overheard you say

7    I ain't going to put up with a bunch of

8    ignorant niggers on my job, would they be

9    lying?

10             A.    No, sir.  I did not say that.

11             Q.    Okay.  So --

12                   MR. WILSON:  Listen to his

13                        question.  Go ahead.

14             Q.    If Barry Buckhanon and Rodney

15   Fraley said that you said that, would they

16   be lying?

17             A.    Yes.

18             Q.    Okay.  So you deny making a

19   statement like that; is that correct?

20             A.    That's right.

21             Q.    In speaking directly to Barry

22   Buckhanon and Rodney Fraley, have you ever

23   said, Your kind don't know anything?

# FREEDOM COURT REPORTING

32

1          A.     That's quite not the way I

2     put it.

3          Q.     How did you put it?

4          A.     We were trying to get some

5     work done.  I told them -- three times I

6     told them this.  You don't know nothing

7     about what we're doing.  And they didn't.

8          Q.     Okay.  You never said these

9     words, quote, Your kind don't know

10    anything, when you were addressing

11    Buckhanon and Fraley?

12         A.     No, sir.  No, sir.  I told

13    them about what we were doing.

14         Q.     Okay.  In referring to

15    another black employee on the job site,

16    have you ever said in the presence of

17    Barry Buckhanon and Rodney Fraley these

18    words, Niggers like him don't know

19    anything?

20         A.     No, sir.

21         Q.     Do you deny making that

22    statement?

23         A.     Yes, sir.  I deny that.

# FREEDOM COURT REPORTING

33

1    Q.    Do you routinely use racial

2    slurs in referring to black employees?

3    A.    No, sir.

4    Q.    How about when you're

5    referring to black folks in general?

6    A.    No.

7    Q.    Do you routinely call black

8    folks niggers?

9    A.    No.

10   Q.    If people said that you did

11   on the job site, they would be lying,

12   right?

13   A.    Right.

14   Q.    Do you see anything wrong in

15   using the word nigger?

16   A.    I don't see nothing wrong

17   with it.

18   Q.    Okay.  How do you think it

19   makes black folks feel when they hear

20   people call them niggers?

21   A.    I don't know.  They was

22   calling them niggers in the Bible.

23   Q.    Well, do you think that's

# FREEDOM COURT REPORTING

34

1   acceptable?

2          A.     Huh?

3          Q.     Do you think that's

4   acceptable?

5          A.     I can't answer that.

6          Q.     Are you saying the Bible --

7          A.     I don't call them black

8   people -- I mean niggers.  I call them

9   black people.

10          Q.     Are you telling me that the

11  Bible says that it's all right to call

12  black folks niggers?

13          A.     I'm telling you the Bible

14  called them niggers.

15          Q.     Can you give me a passage

16  that says that?

17          A.     Go to Acts 13, first verse,

18  first paragraph

19          Q.     Acts what?

20          A.     Acts 13.

21          Q.     Chapter 13?

22          A.     Right.

23          Q.     What verse; do you know?

# FREEDOM COURT REPORTING

35

```
 1          A.     Yeah.   First verse.
 2          Q.     Okay.   And that's the King
 3   James version?
 4          A.     Right.
 5          Q.     Do you consider yourself a
 6   racist?
 7          A.     No, sir.
 8          Q.     Do you feel like you as a
 9   white person are superior to black people?
10          A.     No, sir.
11          Q.     Do you feel like you as a
12   white person are superior to Hispanic
13   people?
14          A.     No, sir.
15          Q.     Have you got any black
16   friends?
17          A.     Yes, sir.
18          Q.     Can you name some of them?
19          A.     I've got all the George
20   Warren family.   Been knowing them for
21   years.
22          Q.     Where does George Warren
23   live?
```

# FREEDOM COURT REPORTING

36

1      A.    He's a concrete finisher.

2      Q.    He's a what?

3      A.    Concrete finisher.

4      Q.    Okay.  And where does he

5  live?

6      A.    Right now he's not doing

7  anything.  He had a stroke.

8      Q.    Okay.  Does he work for Huff

9  and Associates?

10      A.    He used to.  But he always

11  subbed.

12      Q.    How could I find him today?

13      A.    Just look in the telephone

14  book.  George Warren.

15      Q.    In what city?

16      A.    Right here in Auburn.

17      Q.    Have you got any other black

18  friends other than George Warren?

19      A.    Yeah.  But I can't think of

20  their names.  Ervin is a good friend of

21  mine.  Cartlidge.  That's his name.  He's

22  a good friend of mine.

23      Q.    Where does he live?

# FREEDOM COURT REPORTING

37

1          A.    He's a laborer on the job.

2          Q.    Okay.  Now, when you say good

3    friends, do y'all ever socialize together?

4          A.    Used to.

5          Q.    What do you do together?

6          A.    Well, we've ate dinner

7    together several times.  We just -- we

8    were just good friends.

9          Q.    Have you ever been to his

10   home?

11         A.    Oh, yeah.

12         Q.    And you've had dinner at his

13   house?

14         A.    No, sir.  I never ate at his

15   house.

16         Q.    Okay.  Where did y'all eat

17   together?

18         A.    Went up here at the little

19   restaurant.

20         Q.    While you were on the job?

21         A.    Yeah.  Walter Groves was

22   another one.  That's a brick mason.

23         Q.    What's that last name?

# FREEDOM COURT REPORTING

38

1      A.      Walter Groves.

2      Q.      Can you spell that last name?

3      A.      G-R-O-V-E-S.

4      Q.      And where does he live?

5      A.      I don't know that.

6      Q.      Does he live here in Lee

7  County?

8      A.      No, sir.  Yeah.  I believe he

9  does live in Lee County.

10      Q.      Okay.

11      A.      May live in Notasulga now.

12      Q.      Have you ever made any

13  insulting and denigrating comments to the

14  Hispanic workers working on your job site?

15      A.      No, sir.

16      Q.      Have you ever told these

17  Hispanic workers that they didn't know

18  nothing, they need to go back to Mexico?

19      A.      No.  I didn't say they didn't

20  know nothing.

21      Q.      Have you ever told them they

22  need to go back to Mexico?

23      A.      In joking sometimes they'd

# FREEDOM COURT REPORTING

39

1    mess up and I'd say, What you need to do

2    is go on back to Mexico.  Yes, I did.

3          Q.    And you say it was said in a

4    joking manner?

5          A.    Yeah.

6          Q.    Do you routinely swear and

7    curse while you're supervising your

8    employees?

9          A.    No, I did not.  I don't curse

10   nobody, and I don't want nobody cursing

11   me.

12         Q.    Is it your testimony that you

13   don't use profane language?

14         A.    No, sir.

15         Q.    You do not?

16         A.    I do not.

17         Q.    And if some of your former

18   employees said that you did, they'd be

19   lying?

20         A.    Yes, they would.

21         Q.    Have you ever ridiculed and

22   insulted your employees?

23         A.    I don't think so.

# FREEDOM COURT REPORTING

40

1    Q.    When was the last time you

2  used the word nigger referring to a black

3  person?

4    A.    I don't use the word nigger.

5    Q.    Okay.  You've never used it?

6    A.    No.  That's something I try

7  not to use.

8    Q.    Okay.  Let me show you a

9  couple of documents here, Mr. Myers.  The

10  first one is what I've marked as

11  Plaintiffs' Exhibit Number 1 and I'd ask

12  you if you've ever seen that document

13  before?

14    A.    That was --

15      MR. WILSON:  Listen to him.  He

16        wants to know if you've

17        seen it.

18    A.    Yes.  I've seen it.

19    Q.    Okay.  What is that?

20    A.    That's a separation from the

21  job.

22    Q.    Okay.  For who?

23    A.    For Barry Buckhanon.

# FREEDOM COURT REPORTING

41

1      Q.     And did you sign that

2   document?

3          A.     Right there.

4      Q.     Okay.  And what were the

5   circumstances under which Mr. Buckhanon

6   left that job?

7          A.     Well, he said he could do it.

8   I let him go once before because of the

9   same thing.  But he got to staggering

10  around.  He can't hardly walk.  Somebody

11  like that don't need to be on the job.

12     Q.     What do you mean?  Was he

13  intoxicated?

14         A.     No.  His legs wouldn't --

15  wouldn't carry him.  I sent him up the

16  stairs to get something another, and it

17  looked like he was going to fall before he

18  got back down.  I can't take that chance.

19     Q.     Okay.  I believe you said he

20  went to work there in early June of 2004?

21         A.     Right.

22     Q.     Did you terminate him at some

23  point after that the first time?

# FREEDOM COURT REPORTING

42

1       A.      I terminated him right here.

2       Q.      Okay.  You said you had let

3   him go once before?

4       A.      I let him go home.  And he

5   come back up there and spent a whole day

6   trying to get back on before I sent this

7   sheet in to the office.

8       Q.      Okay.  So you only fired him

9   one time, right?

10      A.      Right.

11      Q.      Okay.  But you had sent him

12  home once before?

13      A.      Right.

14      Q.      And what did you send him

15  home for?

16      A.      Same thing.  He had a hard

17  time walking.

18      Q.      Okay.  Did he have some sort

19  of disability?

20      A.      His legs.  There was

21  something another wrong with his legs.

22      Q.      Okay.  And what happened the

23  second time when you actually fired him?

# FREEDOM COURT REPORTING

43

1        A.     When he went up the stairs,

2   he come back down them stairs and he was

3   staggering from one side to the other and

4   his leg was giving him trouble.  I

5   realized he couldn't do it.  If I would

6   have kept him, sooner or later we would

7   have wound up in a lawsuit with that.

8        Q.     Did you tell him at that time

9   that you were firing him?

10       A.     I told him to go home.  I

11  didn't need him no more.

12       Q.     Now, Barry Buckhanon says you

13  told him to take tomorrow off?

14       A.     I told him I didn't need him

15  no more.  That's the first time.  I did

16  tell him that.  But he come right on back

17  anyway and kept on begging to get back on.

18  Make sure he got his job back.

19       Q.     Okay.  Well, the second time,

20  did you actually tell him straight out,

21  I'm firing you or I'm terminating you?

22       A.     No.  I told him I won't need

23  you no more.  That's exactly the words I

# FREEDOM COURT REPORTING

44

1    told him.

2         Q.    Okay.  Did you ever pick up

3    Barry Buckhanon and Rodney Fraley in

4    Tallassee and haul them over here to

5    Auburn to work?

6         A.    Several times.

7         Q.    Okay.  And after you had

8    terminated Mr. Buckhanon, did you drive by

9    him one morning when he was standing out

10   there waiting on you to pick him up?

11        A.    No.  I didn't see him.  He

12   wasn't out there.  I told him not to come

13   in.

14        Q.    Okay.  Did you pick up Rodney

15   Fraley that morning?

16        A.    Seems like I did pick him up

17   a couple times.

18        Q.    Did you ever tell Rodney

19   Fraley that you had fired Barry Buckhanon?

20        A.    I didn't tell him I fired

21   him.  I told him I let him go.

22        Q.    Okay.  And how long did

23   Rodney Fraley work for you after that?

# FREEDOM COURT REPORTING

45

1          A.      One day.

2          Q.      And what happened to him?

3          A.      He left.

4          Q.      Did he just quit?

5          A.      (Witness nodding head in the

6     affirmative.)

7          Q.      Do you know why he quit?

8          A.      No, sir.  I never did.

9          Q.      Let me show you what I've

10    marked as Plaintiffs' Exhibit Number 2 and

11    ask you if you've ever seen that document

12    before?

13         A.      Yeah.

14         Q.      What is that?

15         A.      That's Rodney Fraley.  He

16    quit.

17         Q.      Okay.  Did you sign this

18    document?

19         A.      Right.

20         Q.      Okay.  And let me show you

21    what I've marked as Plaintiffs' Exhibit

22    Number 3 and ask if you've ever seen that

23    document?

# FREEDOM COURT REPORTING

46

1          A.      Yes, sir.

2          Q.      What is that?

3          A.      Bobby Nichols, he quit.

4          Q.      Okay.  Do you know why he

5    quit?

6          A.      No.

7          Q.      Let me show you what I've

8    marked as Plaintiffs' Exhibit Number 4 and

9    ask if you recognize that document?

10         A.      Now, he quit because he

11   got --

12              MR. WILSON:  He just asked if

13                 you recognize the document

14         A.      Yeah.  I recognize it.

15         Q.      What is it?

16         A.      That's where he quit.

17         Q.      Okay.  Is this on John

18   McDade?

19         A.      But he got in trouble with

20   the law.

21         Q.      I said is this on John

22   McDade?

23         A.      Yeah.

# FREEDOM COURT REPORTING

47

1          Q.    Okay.  Now, go ahead and

2     finish your answer.

3          A.    But he got in trouble with

4     the law, and he was never -- we couldn't

5     pick him up.

6          Q.    Who couldn't pick him up?

7          A.    Nobody could.  He was in

8     jail.

9          Q.    Okay.  Well, did he quit?

10         A.    Yeah.

11         Q.    Mr. McDade quit?

12         A.    (Witness nodding head in the

13    affirmative.)

14         Q.    Do you know why he quit?  Was

15    it because he was in jail?

16         A.    Yeah.

17         Q.    Let me show you what I've

18    marked as Plaintiffs' Exhibit 5 and ask

19    you if you recognize that?

20         A.    Yes, sir.  He quit.

21         Q.    Who is that?

22         A.    That's Robert Connell.

23         Q.    Do you know why he quit?

# FREEDOM COURT REPORTING

48

1          A.      No.

2          Q.      Did you sign this document?

3          A.      Right.

4          Q.      Did you sign all of these

5     documents that I've marked as Plaintiffs'

6     Exhibits 1 through 5?

7          A.      Right.

8          Q.      Okay.  All of these people

9     worked under your supervision?

10         A.      Correct.  Right.

11         Q.      Let me show you what I've

12    marked as Plaintiffs' Exhibit Number 6 and

13    ask you if you recognize that document?

14         A.      Travis Gilson?

15         Q.      Yes.

16         A.      Travis got to where he wasn't

17    -- yeah, I recognize it.

18         Q.      Why did Mr. Gilson quit?

19         A.      He was working with his

20    cousin or some of his kinfolks over the

21    week.  He'd come over here and work one or

22    two days, and that was it.

23         Q.      Have you had a lot of

# FREEDOM COURT REPORTING

49

1    turnover in the people that work under

2    you?

3         A.    Just that one job.

4         Q.    Do you know where James

5    Langley is living or working these days?

6         A.    James Langley is not working

7    right now.  He got hurt on the job.

8         Q.    Do you know where he lives?

9         A.    No, sir.  I don't know the

10   address.

11        Q.    Does he live in Tallassee?

12        A.    Yeah.

13        Q.    Is he a friend of yours?

14        A.    Just working friend.

15        Q.    Have you talked to any of

16   these people that are listed on

17   Plaintiffs' Exhibits 1 through 6 since

18   this lawsuit was filed?

19        A.    No.

20             MR. BOWLES:  Okay.  I believe

21             that's all, Mr. Myers.

22             Thank you, sir.

23             MR. WILSON:  Okay.  That's it.

# FREEDOM COURT REPORTING

50

1              MR. BOWLES:  I'd like to offer

2              Plaintiffs' Exhibits 1

3              through 6 as attachments to

4              the deposition.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

51

1                    CERTIFICATE

2

3    STATE OF ALABAMA

4    ELMORE COUNTY

5

6            I hereby certify that the

7    above and foregoing deposition was

8    taken down by me in stenotype and the

9    questions and answers thereto were

10   transcribed by means of computer-aided

11   transcription, and that the foregoing

12   represents a true and correct transcript

13   of the testimony given by said witness

14   upon said hearing.

15           I further certify that I am

16   neither of counsel, nor of kin to the

17   parties to the action, nor am I in anywise

18   interested in the result of said cause.

19

20

21       *Virginia Denese Barrett*___

22   VIRGINIA DENESE BARRETT

23   MY COMMISSION EXPIRES 5/19/07

DATE: _7-30-0__    EMPLOYEE SEPARATION NOTICE

| NAME Barry L. Buckhannon | DEPARTMENT | EFFECTIVE DATE 7-26-04 |
|---|---|---|

| EMPLOYEE NUMBER 812 | SOCIAL SECURITY NUMBER 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 | PAYROLL CLASSIFICATION Carpenter- | FILE NUMBER |
|---|---|---|---|

| REASON | COMMENTS |
|---|---|
| ☐ NO WORK | Unable to perform |
| ☐ ABSENCE | assigned jobs |
| ☐ SICKNESS | |
| ☐ DEATH | |
| ☒ DISCHARGED | |
| ☐ QUIT | |
| ☐ OTHER _____ | |

| THIS FORM MUST BE COMPLETED AND FILED WITH OFFICE IMMEDIATELY UPON RELEASE OF EMPLOYEE | EMPLOYEE SUPERVISOR _Robin Muss_ | DATE 7-30-04 | PERSONNEL DEPARTMENT | DATE |
|---|---|---|---|---|
| | DEPARTMENT SUPERVISOR | DATE 7-30-04 | PAYROLL DEPARTMENT _Deborah Stone_ | DATE 7-30-04 |

**PLEASE PROVIDE FORWARDING ADDRESS:

_____    **W-2 WILL BE SENT TO THIS ADDRESS
NAME

_____
ADDRESS

_____
ADDRESS

_____
CITY, STATE, ZIP CODE

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked? (Circle One)    YES / NO / N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?    (CIRCLE ONE)    YES / NO / N/A

EMPLOYEE FILE COMPLETED: _____    _____
                          DATE              INITIALS

PLAINTIFF'S
EXHIBIT
1

EEOC
00048

DATE: _7-30-04_    EMPLOYEE SEPARATION NOTICE

| NAME Rodney J. Fraley | DEPARTMENT | EFFECTIVE DATE 7-27-04 |
|---|---|---|

| EMPLOYEE NUMBER | SOCIAL SECURITY NUMBER 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 | PAYROLL CLASSIFICATION | FILE NUMBER |
|---|---|---|---|

| REASON | COMMENTS |
|---|---|

REASON

- [ ] NO WORK
- [ ] ABSENCE
- [ ] SICKNESS
- [ ] DEATH
- [ ] DISCHARGED
- [X] QUIT
- [ ] OTHER _____

| THIS FORM MUST BE COMPLETED AND FILED WITH OFFICE IMMEDIATELY UPON RELEASE OF EMPLOYEE | EMPLOYEE SUPERVISOR Bobby Moses | DATE 7-30-04 | PERSONNEL DEPARTMENT | DATE |
|---|---|---|---|---|
| | DEPARTMENT SUPERVISOR | DATE 7-30-04 | PAYROLL DEPARTMENT Deborah Stow | DATE 7-31-04 |

**PLEASE PROVIDE FORWARDING ADDRESS:

**W-2 WILL BE SENT TO THIS ADDRESS

NAME _____

ADDRESS _____

ADDRESS _____

CITY, STATE, ZIP CODE _____

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked?  (Circle One)      YES  /  NO  /  N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?      (CIRCLE ONE)    YES  /  NO  /  N/A

EMPLOYEE FILE COMPLETED: _____
DATE _____  INITIALS _____

PLAINTIFF'S EXHIBIT
_P_

EEOC
00055

# EMPLOYEE SEPARATION NOTICE

DATE: _____

| NAME | DEPARTMENT | EFFECTIVE DATE |
|---|---|---|
| Bobby Nichols | | 9/30/04 |

| EMPLOYEE NUMBER | SOCIAL SECURITY NUMBER | PAYROLL CLASSIFICATION | FILE NUMBER |
|---|---|---|---|
| | | | |

## REASON                COMMENTS

- [ ] NO WORK
- [ ] ABSENCE
- [ ] SICKNESS
- [ ] DEATH
- [ ] DISCHARGED
- [✓] QUIT
- [ ] OTHER _____

THIS FORM MUST BE COMPLETED AND FILED WITH OFFICE IMMEDIATELY UPON RELEASE OF EMPLOYEE

| EMPLOYEE SUPERVISOR | DATE | PERSONNEL DEPARTMENT | DATE |
|---|---|---|---|
| *[signature]* | | | |
| DEPARTMENT SUPERVISOR | DATE | PAYROLL DEPARTMENT | DATE |
| | | *Deborah Straw* | |

**PLEASE PROVIDE FORWARDING ADDRESS:

**W-2 WILL BE SENT TO THIS ADDRESS

NAME _____

ADDRESS _____

ADDRESS _____

CITY, STATE, ZIP CODE _____

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked?  (Circle One)        YES  /  NO  /  N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?        (CIRCLE ONE)    YES  /  NO  /  N/A

EMPLOYEE FILE COMPLETED: _____        _____
                          DATE                    INITIALS

**PLAINTIFF'S EXHIBIT 3**

# EMPLOYEE SEPARATION NOTICE

DATE: _____

| NAME | DEPARTMENT | EFFECTIVE DATE |
|---|---|---|
| John Mc Dade | | 7/15/04 |

| EMPLOYEE NUMBER | SOCIAL SECURITY NUMBER | PAYROLL CLASSIFICATION | FILE NUMBER |
|---|---|---|---|
| | | | |

## REASON

- [ ] NO WORK
- [ ] ABSENCE
- [ ] SICKNESS
- [ ] DEATH
- [ ] DISCHARGED
- [x] QUIT
- [ ] OTHER _____
_____

## COMMENTS

got on trial could Not come Back

THIS FORM MUST BE COMPLETED AND FILED WITH OFFICE IMMEDIATELY UPON RELEASE OF EMPLOYEE

| EMPLOYEE SUPERVISOR | DATE | PERSONNEL DEPARTMENT | DATE |
|---|---|---|---|
| Bobby Myers | | | |
| DEPARTMENT SUPERVISOR | DATE | PAYROLL DEPARTMENT | DATE |
| | | Deborah Stone | |

**PLEASE PROVIDE FORWARDING ADDRESS:

_____
NAME

_____
ADDRESS

_____
ADDRESS

_____
CITY, STATE, ZIP CODE

**W-2 WILL BE SENT TO THIS ADDRESS

---

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked? (Circle One)      YES  /  NO  /  N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?      (CIRCLE ONE)   YES  /  NO  /  N/A

EMPLOYEE FILE COMPLETED: _____      _____
                          DATE                  INITIALS

PLAINTIFF'S
EXHIBIT
4

EEOC
00027

# EMPLOYEE SEPARATION NOTICE

DATE: _____

| NAME | DEPARTMENT | EFFECTIVE DATE |
|------|-----------|----------------|
| Robert Connell | | 7/05/04 |

| EMPLOYEE NUMBER | SOCIAL SECURITY NUMBER | PAYROLL CLASSIFICATION | FILE NUMBER |
|-----------------|------------------------|------------------------|-------------|

## REASON

- [ ] NO WORK
- [ ] ABSENCE
- [ ] SICKNESS
- [ ] DEATH
- [ ] DISCHARGED
- [x] QUIT
- [ ] OTHER _____

_____

**COMMENTS**

THIS FORM MUST BE COMPLETED
AND FILED WITH OFFICE
IMMEDIATELY UPON RELEASE
OF EMPLOYEE

| EMPLOYEE SUPERVISOR | DATE | PERSONNEL DEPARTMENT | DATE |
|---------------------|------|----------------------|------|
| *Bobby Myers* | | | |
| DEPARTMENT SUPERVISOR | DATE | PAYROLL DEPARTMENT | DATE |
| | | *Deborah Stow* | |

**PLEASE PROVIDE FORWARDING ADDRESS:

_____
NAME

_____
ADDRESS

_____
ADDRESS

_____
CITY, STATE, ZIP CODE

**W-2 WILL BE SENT TO THIS ADDRESS

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked? (Circle One)    YES  /  NO  /  N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?    (CIRCLE ONE)    YES  /  NO  /  N/A

EMPLOYEE FILE COMPLETED: _____    _____
                          DATE                INITIALS

**PLAINTIFF'S EXHIBIT 5**

EEOC
00024

# EMPLOYEE SEPARATION NOTICE

DATE: _____

| NAME | DEPARTMENT | EFFECTIVE DATE |
|---|---|---|
| Travis Gilson | | 6/24/2004 |

| EMPLOYEE NUMBER | SOCIAL SECURITY NUMBER | PAYROLL CLASSIFICATION | FILE NUMBER |
|---|---|---|---|
| | | | |

## REASON

| | |
|---|---|
| ☐ | NO WORK |
| ☐ | ABSENCE |
| ☐ | SICKNESS |
| ☐ | DEATH |
| ☐ | DISCHARGED |
| ☑ | QUIT |
| ☐ | OTHER _____ |

### COMMENTS

THIS FORM MUST BE COMPLETED AND FILED WITH OFFICE IMMEDIATELY UPON RELEASE OF EMPLOYEE

EMPLOYEE SUPERVISOR _____ DATE

DEPARTMENT SUPERVISOR _____ DATE

PERSONNEL DEPARTMENT _____ DATE

PAYROLL DEPARTMENT _____ DATE

**PLEASE PROVIDE FORWARDING ADDRESS:

_____
NAME

_____
ADDRESS

_____
ADDRESS

_____
CITY, STATE, ZIP CODE

**W-2 WILL BE SENT TO THIS ADDRESS

---

FOR OFFICIAL USE ONLY

DATE OF LAST PAYROLL CHECK: _____

Employee Backcharges Checked? (Circle One)        YES  /  NO  /  N/A

Employee Health Ins. (or Misc. Ded.) Recap Done?        (CIRCLE ONE)    YES  /  NO  /  N/A

EMPLOYEE FILE COMPLETED: _____        _____
                          DATE                  INITIALS



PLAINTIFF'S EXHIBIT
6

EEOC
00002