IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| BARRY BUCKHANON, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | CASE NO. 3:05-cv-741-WKW |
| ) | |
| HUFF & ASSOCIATES CONSTRUCTION ) | |
| COMPANY, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Before the court is defendant's Motion for Summary Judgment (Doc. # 14) on all counts. For the reasons that follow, the motion is due to be GRANTED.

**I.  FACTS AND PROCEDURAL HISTORY**

This action charges employment discrimination under 42 U.S.C. § 1981 ("section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  Plaintiffs allege that the defendant subjected them to a hostile working environment based upon their race and intentionally discriminated against them because they are African-Americans.  The court construes the facts of this case in the light most favorable to the plaintiffs as the non-moving parties.

Rodney Fraley and Barry Buckhanon (hereinafter referred to as "Fraley" and "Buckhanon" respectively, and "plaintiffs" collectively) are African-American males who were employed with Huff & Associates Construction Company, Inc. (hereinafter referred to as "Huff" and sometimes referred to as "defendant"), for approximately two months in 2004.  Huff's principal line of business is construction contracting.  The plaintiffs were both employed on a construction project in Auburn, Alabama.  Fraley was employed as a laborer from June 1, 2004, until he resigned from his position

on or about July 27, 2004. Buckhanon was employed as a cleanup crew member from June 1, 2004, until he was terminated on or about July 26, 2004. Bobby Myers ("Myers"), a white male, was the superintendent in charge of the job site and was plaintiffs' supervisor.[1] Myers frequently transported plaintiffs from their homes to the job site. Plaintiffs also ate lunch with Myers on a daily basis. However, plaintiffs allege that throughout their two month tenure with Huff, they were subjected to hostile comments from Myers that referenced their race. Plaintiffs point to two specific instances of alleged hostile conduct that they either overheard or that was directed at them by Myers. One instance occurred while plaintiffs were eating lunch with Myers and Jimmy Langley ("Langley").[2] While "just talking," Myers, allegedly without provocation, stated to plaintiffs that "ya'll's [sic] kind don't know nothing." (Buckhanon's Dep. 39:3-6.)[3] Buckhanon testified that when he asked Myers what he meant by that statement, he said "you know what I mean." (*Id.* 41:23-4.) In the same conversation, Myers allegedly stated that "niggers like him don't know anything." (*Id.* 73:17-22.) Plaintiff Buckhanon testified that this statement was directed at the plaintiffs collectively. However, plaintiffs initially alleged in their complaint that Myers directed the statement toward "another black employee . . ." who remains unidentified. (Compl. ¶ 17.)

---

[1] Myers admits that he was "the highest ranking employee of the company on the job site." (Myers's Dep. 17:10-13.) Additionally, John Huff, Jr., President of Huff, agreed that Myers had the ability to hire and fire employees in his position as superintendent of the job site. (Huff's Dep. 22:4-7.)

[2] Langley worked for Huff as a carpenter and also acted as the plaintiffs' supervisor when Myers was away from the job site.

[3] Myers's exact words are in dispute. Buckhanon stated that Myers exclaimed that "ya'll's [sic] kind don't know nothing." (Buckhanon's Dep. 39:6.) In the same deposition, Buckhanon repeated the words Myers used as "niggers like ya'll [sic] don't know anything." (*Id.* 77:12:13.) Fraley testified that Myers said that "ya'll [sic] niggers don't know nothing." (Fraley's Dep. 26:18-19.) The court understands the degrading racial context of each of these statements.

Plaintiffs recount another instance in which they overheard Myers use a racial epithet. The plaintiffs were on the job site in the company of Langley. Myers was off the job site, but was communicating with Langley through a two-way radio. Plaintiffs testified that Myers asked Langley about the status of the job site, *i.e.*, whether the employees were doing their jobs. Langley responded that "[the crew] had a little slow start." (Buckhanon's Dep. 37:13-14.) Further, Langley commented that a worker was slowly cleaning a brick. (*Id.* 36:9-10.) Myers allegedly responded by saying "[I'm] not going to put up with a bunch of niggers on [my] job site." (*Id.* 36:16-17.) It is undisputed that Myers did not know of the plaintiffs' ability to hear his voice when he made the comment. (*Id.* 3-6.)

Plaintiffs allege other episodes involving Myers but none with specificity as to racial content. For example, plaintiff Buckhanon alleges that Myers called them "dumb [and] stupid." (*Id.* 42:6-8.) However, plaintiffs admit that Myers made similar comments to and "cuss[ed]" other employees, white and black alike. (*Id.* 75:13-22; *see also* Fraley's Dep. 31:7-9; 43:5-16; 44:3-15.) White and black employees alike left employment with Huff because of Myers's alleged abusive behavior toward his workers. Additionally, Myers allegedly made remarks to Hispanic employees that "they don't know nothing" and "to go back where they came from." (Buckhanon's Dep. 45:15-22.) Plaintiffs also aver that Myers "routinely used racial slurs in referring to black employees." (Compl. ¶ 14.) However, Buckhanon testified that he never heard Myers make racial slurs to any other African-American employees. (*See* Buckhanon's Dep. at 48:7-14.) Plaintiffs further claim that Myers used the word "nigger" on "plenty" of occasions, although they can only point to three specific instances where they either overheard the word or where the word was used toward them.

3

On his last day with Huff, Buckhanon recounts that he and Fraley were "working down on the party house . . . [a]nd it started coming up a real bad storm." (*Id.* 49:17-21.) Plaintiffs were "drilling holes inside the building" and had the cord to the drill outside of the building. (*Id.* 49:23; 50:1-5.) At some point, lightning and thunder descended upon the job site. Buckhanon told "the Mexican guys . . . to get down, and . . . put up the cord." (*Id.* 50:3-5.) Myers asked the plaintiffs why they had put up the cord. Plaintiffs responded that they did so in order to get out of the lightning. Myers exclaimed that plaintiffs should not "get out of the lightning 'til I tell you to." (*Id.* 50:10-12.) Buckhanon refused to work in the lightning, so Myers told him to "stay at home tomorrow." (*Id.* 50:14-20.) The next day Myers told Fraley that Buckhanon was fired. Myers disagrees that he told Fraley that Buckhanon was fired, but he admits that Buckhanon was in fact fired because of a knee injury that interfered with his work. Fraley quit the next day because he could no longer tolerate the alleged abusive behavior of Myers.

After Buckhanon's termination and Fraley's resignation, both plaintiffs went to the job site on July 28, 2004, to obtain their last pay check from Myers. Jerry Garrett ("Garrett"), an acquaintance of the plaintiffs, drove them to the job site where they met Langley and Myers. Myers asked whether the plaintiffs were going to repay him five dollars that they borrowed from him for lunch. Buckhanon responded that they did not have the money at the moment, but Myers could "follow [them] to the bank." (*Id.* 55:10-11.) Myers stated that the plaintiffs were not "getting [their] check till [he got his] five dollars . . . ." (*Id.* 55:12-13.) Buckhanon alleges that Myers cussed at them, without offering any specifics as to Myers' exact language. However, Fraley insists that Myers called them "ignorant niggers." (Fraley's Dep. 37:4-5.) Garrett submitted an affidavit in which he alleges that he overheard Myers call the plaintiffs "mother-f- - - - -g niggers," "black bastards," and

4

"ignorant niggers" on that occassion. (Garrett Aff. 2.) In his affidavit, Garrett also stated that he heard Myers frequently use the word "nigger" outside the work environment at Hilyer's Auto Parts in Tallassee, Alabama.

Bobby Dean Nichols ("Nichols") also submitted an affidavit in support of plaintiffs' allegations. Nichols started work with Huff on the construction project as a laborer on July 26, 2004, which was coincidently Buckhanon's last day of employment. Nichols testified that "[d]uring the next couple of days [he] personally heard Myers use the word 'nigger' when speaking to Buckhanon and/or Fraley. Myers used the word 'nigger' frequently in speaking to and about African-Americans." (Nichols Aff. 1.) Nichols further testified that Myers "constantly curs[ed] and berat[ed] the employees working under his supervision." *Id.*

Plaintiffs have exhausted all available administrative remedies and filed this complaint within 90 days of the EEOC's Notice of Right to Sue.

## II. JURISDICTION AND VENUE

Because this case arises under section 1981 and Title VII, the court exercises subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331. The parties do not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

## III. SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A genuine factual dispute exists if the "jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1358 (11th Cir. 1999) (citation omitted). After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

## IV. DISCUSSION

Plaintiffs bring this action under both Title VII and section 1981, which "have the same requirements of proof and use the same analytical framework . . . ." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). The court will address only the framework of Title VII with the assumption that such rationale also addresses the plaintiffs' claim under section 1981.

Title VII reads in pertinent part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In order to establish a *prima facie* case of hostile work environment, the plaintiffs must show

> (1) that [they] belong[ ] to a protected group; (2) that [they have] been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee[s], such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller*, 277 F.3d at 1275.

For purposes of a *prima facie* case, the parties agree that the plaintiffs are members of a protected group (African-Americans) and they were "subjected to two isolated unwelcome statements of a racially-oriented connotation." (Def.'s Summ. J. Br. 7.) The parties do not agree that the harassment was based upon a protected class, that the harassment was sufficiently severe or pervasive, or that Huff was responsible for the alleged hostile environment. The court will take up the contentions of the defendants in two parts: (1) whether the unwelcome harassment was based upon a protected class, and (2) whether the alleged harassment was sufficiently severe or pervasive.

Because the plaintiffs have not established, for purposes of summary judgment, that the alleged harassment of the plaintiffs by Myers was sufficiently severe or pervasive, the court need not address whether Huff is vicariously liable for the harassment.

### A.    *Harassment Based upon Protected Class*

Plaintiffs' evidentiary submission does not distinguish a work environment that is hostile to African-Americans from a work environment that is hostile to all employees.  For instance, Buckhanon testified, when asked about Myers's use of derogatory remarks toward African-Americans, that Myers would "get to fussing at them or hollering or something if they ain't doing something the exact way he wants it." (Buckhanon's Dep. 47:23; 48:1-6.)  Fraley agreed that Myers would "cuss and kind of get in [all employees'] faces about getting things done . . . ." (Fraley's Dep. 31:2-6.)  However, when both plaintiffs were asked whether Myers made racial slurs at other African-American employees, they stated that he did not. (*Id.* 29:23; 30:1-5; Buckhanon's Dep. 48:10-14.)[4]  Plaintiffs' evidence does not establish that Myers singled them out because they were African-American.

Throughout plaintiffs' depositions, they refer to the alleged constant "cussing and fussing" that Myers used in his everyday interactions with all of his employees.  They also recount various situations where Myers specifically "cussed and fussed" directly at them.  Defendant argues that such foul language should not be considered in the court's *prima facie* case analysis.  Defendant is correct in that Myers's "cussing and fussing," although foul and inconsiderate, does not rise to the level of

---

[4]  The remarks Myers made to the Mexican-American workers are irrelevant to the outcome of this action. The remarks were not directed at plaintiffs, nor did they reference plaintiffs' protected class.  It is evidence, however, of a working environment that is generally hostile for all employees, without regard to any protected classification.

harassment as envisioned by Congress in Title VII or Section 1981. *See Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1301 (11th Cir. 2007) ("Title VII does not prohibit profanity alone, however profane. It does not prohibit harassment alone, however severe and pervasive.")

This is not to say that a racially hostile work environment cannot exist without racial epithets, but there must be evidence sufficient to convince a jury that employees within a protected class were singled out because of their protected class. The issue is not the "cussing and fussing" that Myers hurled at all employees on the job site but rather the alleged racially hostile remarks directed toward African-Americans employed with Huff. To the extent that Myers used the term "nigger" to refer to the plaintiffs, it is self-evident that, when viewed in the plaintiffs' favor, such harassment is based upon a protected classification. Plaintiffs have proffered evidence of at least three occasions where they were either subjected to or overheard Myers use racial epithets. As such, plaintiffs have fulfilled the third prong of their *prima facie* case.

**B.**   *Severe or Pervasive*

Plaintiffs must establish "that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Miller*, 277 F.3d at 1275. The work environment "must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "In prosecuting such claim, the employee should present concrete evidence in the form of specific facts, not just conclusory allegations and assertions." *Laosebikan v. Coca-Cola, Co.*, 2006 WL 224167, NO. 01-03040-CV-RWS-1, (11th Cir. Jan. 31, 2006) (quoting *Earley v. Champion Internat'l Corp.*, 907 F.3d 1077, 1081 (11th Cir. 1990)).

1. Subjective Component

It is not debatable that the plaintiffs perceived their working environment as hostile. "The employee must 'subjectively perceive' the harassment as sufficiently sever and pervasive to alter the terms and conditions of employment . . . ." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (quoting *Harris*, 510 U.S. at 21-22). The plaintiffs allege specific facts indicating that they were subjected to racial hostility by Myers, which prompted them to file this action. Plaintiffs obviously perceived their work environment to be racially hostile, thereby fulfilling the subjective component of the court's inquiry.

2. Objective Component

In order for plaintiffs to carry their burden at this stage of the proceedings, it is imperative that their "subjective perception . . . be objectively reasonable." *Harris*, 510 U.S. at 21-22. The United States Supreme Court has directed that courts consider "all the circumstances" in determining the objective component of hostile work environment claims, including taking into account the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* at 23. Plaintiffs' case in chief falters at this juncture. Plaintiffs have failed to proffer evidence of sufficiently severe or pervasive harassment which would alter the terms and conditions of their employment and create a discriminatorily abusive working environment when viewed through the lens of a reasonable person.

a. *Frequency*

The incidents of which the plaintiffs complain were not frequent. Plaintiffs worked for defendant for less than two months. During this period, plaintiffs point to two specific examples

where racial epithets were directed against them and one specific occasion where Myers used an epithet in reference to all African-American employees. Additionally, Nichols testified that, while he was a co-worker for one day with Buckhanon and two days with Fraley, he "heard Myers use the word 'nigger' when speaking to [plaintiffs] . . . and use the word . . . frequently in speaking to and about African-Americans." (Nichols Aff. at 1.) However, plaintiffs did not hear Myers use these racial slurs toward other African American employees, and they could not recall other specific situations where Myers used derogatory comments toward them.[5] (Buckhanon Dep. 48:7-14; Fraley Dep. 29:23; 30:1-5.) Based upon the testimony of plaintiffs, Nichols' testimony is irrelevant to their claims of a hostile work environment.

Three instances of derogatory language in a two month period does not rise to the level of frequency found actionable in Eleventh Circuit precedent. *Compare E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067 (11th Cir. 1990) (holding that district court did not err in finding that daily racial slurs including "nigger," "ignorant niggers," and "swahilis" used by plant manager within a one month time frame of employment rose to the level of a Title VII violation); *with Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501 (11th Cir. 2000) (finding that fifteen specific instances of harassment over four months is not infrequent); *Miller*, 277 F.3d 1269 (finding that sufficient evidence was presented at trial to establish slurs by supervisor were frequent when used three to four times a day); *Mahgoub v. Miami Dade Cmty. Coll.*, No. 04-20039-CV-UUB, 2006 WL 952278 (11th Cir. April 13, 2006) (finding that four specific instances of hostile conduct was insufficient to withstand summary judgment); *Jefferson v. Casual Rest. Concepts, Inc.*, 2006 WL

---

[5] In order to overcome the heavy burden of summary judgment in a Title VII and section 1981 action, plaintiffs must point to *specific* instances of racial hostility, and not offer mere conclusory allegations. *See Earley*, 907 F.2d at 1081.

2244733, No. 8:05-cv-809-T-30MSS, (M.D. Fla. August 4, 2006) (where in a three month period of employment the plaintiff was called nigger 300 times, was called lazy f-----g nigger by the General Manager, was slapped on the behind with a towel by Assistant Manager who subsequently stated that "I just hung me a nigger", and numerous other bigoted visuals and remarks, where such incidents were sufficiently severe and pervasive to overcome summary judgment.) Furthermore, the Supreme Court has cautioned that the "mere utterance of an . . . epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris*, 510 U.S. at 21 (citation and internal quotation marks omitted).

### b. *Severity*

"Harassing conduct is severe when it causes the employee's workplace to become 'permeated with discriminatory intimidation, ridicule, and insult.'" *Hernandez v. Commc'ns Unlimited of the South, Inc.*, No. 3:03cv0760-T, 2005 WL 3803064, at * 5 (M.D. Ala. February 22, 2005) (citing *Harris*, 510 U.S. at 21). The alleged conduct of Myers was not severe in that it did not permeate the work place with discriminatory intimidation. It is undisputed that Myers' two racial slurs made during lunch with plaintiffs were made during the same conversation on the same day. Further, Buckhanon admits that Myers was unaware of plaintiffs presence when he made the third statement over the two-way radio. Three isolated instances over a two month period do not establish a work environment permeated with hostility. *See Harris*, 510 U.S. at 21. The United States Supreme Court and the Eleventh Circuit have reiterated that the standard of Title VII is not whether the employer is hostile, but whether the workplace is "permeated" with discrimination. Additionally, "there is 'not simply some magic number of racial or ethnic insults' that preclude summary judgment, but rather 'it is repeated incidents of . . . harassment that continue despite the employee's

objections [that] are indicative of a hostile work environment.'" *Mack v. ST Mobile Aerospace Eng'g, Inc.*, No. 05-14695, 2006 WL 2129661, at *7 (11th Cir. July 31, 2006) (quoting *Miller,* 277 F.3d at 1276). Although the Supreme Court and the Eleventh Circuit have not explicitly required an employee to complain to the individual harasser about perceived hostile behavior, the evidence, or lack thereof, of complaints is relevant in weighing the severity of the environment. In this situation, plaintiffs not once complained to Myers' about his unacceptable behavior nor did they complain to higher management in Huff. The absence of complaints is a factor that belies a suggestion of severity.

### c. *Humiliation or Physical Threat*

The evidence presented by plaintiffs does not, when viewed in the totality of the circumstances, establish humiliation or physical threat. The court acknowledges that *any* use of "nigger" as described by the plaintiffs *can be* humiliating and physically threatening to an African-American. However, the court cannot assume, without more, that Myers's utterance of the word automatically denotes humiliation and threat. *Cf. Mack*, 2006 WL 2129661, at *7 (holding that seven nooses found on employment site during two year period held to be physically threatening and humiliating). Further, Plaintiffs never once complained of the alleged hostile conduct of Myers to the project manager or to his supervisors. More importantly, plaintiffs never told Myers that they felt threatened or humiliated by his actions. Plaintiffs continued to eat lunch with Myers and allowed him to transport them in his vehicle to the job site until Buckhanon's termination and Fraley's resignation, respectively. There is no evidence that the plaintiffs were constantly berated with racial epithets, made to feel subservient to the other non-African-American workers, or had their lives threatened at the hands of Myers. *Cf. Williams v. Asplundh Tree Expert Co.*, No. 3:05-cv-479-J-

33MCR, 2006 WL 2131299 (M.D. Fla. July 28, 2006) (finding evidence of physically threatening and humiliating harassment sufficient to overcome summary judgment where, among other things, supervisors constructed a noose and told plaintiff to "try it on, nigger," supervisor told plaintiff to run through the woods "like a hog" so that hunting dogs could chase him, and supervisor threatened injury with a wood chipper). There is no evidence that Myers partook in humiliating harassment with the plaintiffs. Plaintiffs have established, however, that *every* worker at Huff who operated under Myers was made to feel less than human by being forced to bear a constant barrage of insults and cursing. Plaintiffs do not establish with specificity that the overall atmosphere of Huff was charged with racial hostility.[6]

### d. *Post-Employment Behavior*

Plaintiffs argue that Myers's behavior at the time they picked up their pay checks subsequent to their termination should be considered as part of the allegation of a hostile work environment. They further argue that Myers's deposition testimony establishes that he is a racist and that Myers made derogatory remarks outside of the work place while at an auto parts store. However, it is undisputed that the plaintiffs were no longer employed with Huff on the day they sought their pay checks from Myers. Further, the plaintiffs were not present to hear the remarks at the auto parts

---

[6] Plaintiffs have proffered no evidence suggesting that the alleged harassing conduct prevented them from effectively performing their jobs. On the contrary, the plaintiffs aver that they have "established a frequency, severity, and humiliating nature of the conduct, [and] any failure . . . to establish convincingly how Myers['] conduct interfered with their duties is not fatal to their hostile environment claims . . . ." (Resp. Summ. J. 10.) The court finds, however, that Fraley has provided no evidence suggesting that he left employment with Huff because of hostility toward African-Americans. *See Mack,* 2006 WL 2129661(finding that evidence that African-American plaintiff provided a written complaint to defendant stating that minorities found employment with defendant difficult because of racial harassment was sufficient to establish that the alleged conduct unreasonably interfered with the plaintiff's employment). Additionally, Buckhanon has not offered any evidence suggesting that his performance was unreasonably hindered by Myers's alleged racial hostility. As previously stated, both plaintiffs have proffered evidence suggesting that Myers was equally uncivil to all employees.

store. Although Myers' remarks on the day the plaintiffs picked up their checks, if true, are regrettable and even humiliating, a hostile work environment claim requires that the employee *be subjected to* the environment. The proper inquiry is not whether Myers is a racist, but whether his alleged racism permeated plaintiffs' work environment. After the plaintiffs' respective resignation and termination, a working relationship ceased to exist between the defendant and the plaintiffs. Even assuming such evidence was relevant and admissible, any incident subsequent to the plaintiffs' employment is not sufficient to defeat summary judgment.

Based on a full consideration of the totality of the circumstances, plaintiffs have failed to establish their *prima facie* case of hostile work environment under Title VII and Section 1981.

## V. CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1. Defendant's Motion for Summary Judgment (Doc. # 14) is GRANTED;

2. All claims against the defendant are DISMISSED;

3. All remaining dates and deadlines are CANCELLED; and

4. An appropriate judgment will be entered.

DONE this 11th day of June, 2007.

　　　　　　　　　　　　　　　　/s/  W. Keith Watkins
　　　　　　　　　　　　　　　　UNITED STATES DISTRICT JUDGE